**CITY MANAGEMENT CORPORATION,**
Plaintiff–Appellee,

v.

**U.S. CHEMICAL COMPANY,**
**INCORPORATED, et al.,**
Defendants,

General Motors Corporation; Sea Ray Boats, Incorporated; Chrysler Corporation; Ford Motor Company; BASF Corporation (Inmont); Reichhold Chemicals, Inc.; Acme Quality Paints Company; Foamseal, Incorporated; Hoover Universal, Incorporated; and Allied–Signal Incorporated (93–1348); Dow Corning Corporation; Upjohn Company; and Grimes Aerospace Company, as successor-in-interest to Midland–Ross Corporation (93–1396), Defendants–Appellants.

Nos. 93–1348, 93–1396.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 10, 1994.

Decided Nov. 10, 1994.

Thomas M. Fallucca (argued and briefed), Glenn R. Matecun, Robert P. Ufer & Associates, Bloomfield Hills, MI, Mark S. Demorest, Hainer & Demorest, Troy, MI, Robert Tuchman, Linnea Brown, Holme, Roberts & Owen, Denver, CO, for City Management Corp.

Charles L. McKelvie, Troy, MI, for U.S. Chemical Co., Inc.

James A. Thompson, Jr., Paul T. Fitzpatrick, LeBoeuf, Lamb, Greene & MacRae, Hartford, CT, Frederick B. Lacey (argued), LeBoeuf, Lamb, Greene & MacRae, Newark, NJ, Lisa M. Bogardus, LeBoeuf, Lamb, Greene & MacRae, New York City, for General Motors Corp., Sea Ray Boats, Inc., Chrysler Corp., Ford Motor Co., BASF Corp., Reichhold Chemicals, Inc., Acme Quality Paints Co., Foamseal, Inc., and Hoover Universal, Inc.

James A. Thompson, Jr., Paul T. Fitzpatrick, LeBoeuf, Lamb, Greene & MacRae, Hartford, CT, Frederick B. Lacey, LeBoeuf, Lamb, Greene & MacRae, Newark, NJ, Lisa M. Bogardus, LeBoeuf, Lamb, Greene & MacRae, New York City, Louis R. Pepe (briefed), Pepe & Hazard, Hartford, CT, for Allied–Signal, Inc.

Robert A. Marsac (argued and briefed), James F. Kamp, Wise & Marsac, Detroit, MI, for Dow Corning Corp., Upjohn Co. and Grimes Aerospace Co.

Before: MILBURN, BOGGS, and NORRIS, Circuit Judges.

MILBURN, Circuit Judge.

In this CERCLA[1] action, defendants appeal the district court's grant of summary judgment to plaintiff City Environmental, Inc.[2] in a dispute over environmental obligations arising from the disposal of hazardous waste at landfills in Michigan. On appeal, the issues are (1) whether the district court erred in holding that even though plaintiff substantially continued the business of U.S. Chemical ("USC"), plaintiff was not liable as a successor for USC's off-site CERCLA liabilities because there was no nexus between plaintiff and USC's off-site liabilities; (2) whether the district court erred in concluding as a matter of law that the transfer in question was not fraudulent under Michigan's Fraudulent Conveyance Act; and (3) whether the district court erred in failing to consider defendant's argument that plaintiff impliedly assumed responsibility for USC's off-site liabilities. For the reasons that follow, we affirm.

## I.

### A.

Defendant USC was incorporated in Michigan in 1962. It is wholly-owned by the two

---

1. "CERCLA" refers to The Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601–9675.

2. The original plaintiff, City Environmental, Inc., merged into City Management Corporation on July 1, 1992. Pursuant to the district court's order, City Management Corporation was substituted as the plaintiff in the case on October 23, 1992. Hereinafter, both City Management Corporation and City Environmental, Inc. are interchangeably referred to as "plaintiff."

individual defendants, William P. Greenway and Leonard F. Coraci, who are the corporation's sole shareholders, officers, and directors. From 1965 until 1990, USC was engaged in the business of solvent reclamation, which involved the treatment, recycling, storage, and disposal of waste-contaminated solvents of its customers, at its facility on Calahan Street in Roseville, Michigan (the "Calahan Property"). As part of these operations, USC would store some its customers' waste-contaminated solvents on the Calahan Property pursuant to its site-specific permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* (the "RCRA"). Some of the solvents were transported to various off-site landfills, including the Metamora Landfill in Lapeer County, Michigan.

Plaintiff City Environmental, Inc. is · an environmental-services company that was incorporated in Michigan in 1982. Since 1985, it has been in the business of treating and processing the industrial waste of its customers at its two facilities in Detroit. Prior to October 12, 1990, plaintiff did not perform solvent-recycling services and it did not have an RCRA permit for waste storage at either of its two facilities.

In 1984, Greenway and Coraci decided to sell either USC or its assets. They decided to sell because (1) Coraci had decided to retire; (2) the market for USC's services was declining; (3) USC's equipment was becoming outdated; (4) they believed that a costly corrective environmental cleanup of the Calahan Property would be required to renew its RCRA permit; and (5) to compete successfully and to meet environmental regulations, USC would have to invest in a substantial marketing effort to become a regional, not just a local company. For five years, Greenway and Coraci unsuccessfully discussed the sale of USC's business with a number of waste-management companies. In mid–1989, USC first contacted plaintiff to inquire whether plaintiff was interested in acquiring USC. Plaintiff expressed an interest in acquiring USC because the acquisition would allow plaintiff to provide its customers additional services under the RCRA permit. Negotiations between the parties ensued in July 1989. During the course of the negotiations, in March 1990, plaintiff retained the services of Techna Corporation to perform an environmental site investigation of the Calahan Property. The investigation, which included oil and groundwater analysis, revealed a significant risk that the Calahan Property was environmentally contaminated. Applied Science, Inc., a second environmental consultant, found significant contamination and recommended further investigation. A third consulting firm, ECT Consultants, was retained by plaintiff in September 1990 to review the Techna report. ECT confirmed the earlier findings of serious contamination on the Calahan Property. Although none of the firms defined the scope and extent of the onsite contamination or estimated what the possible remediation costs would be, plaintiff estimated the costs to be in the range of $1 million to $5 million. Plaintiff also made preliminary investigations of USC's potential off-site CERCLA exposures, but such exposures were not assumed or considered in arriving at a purchase price.

While the negotiations were taking place, USC was notified by the United States Environmental Protection Agency (the "EPA") by certified letter in November 1989 that USC was a potentially responsible party ("PRP") with respect to CERCLA liabilities arising as a result of its dumping of hazardous waste at the Metamora Landfill. The letter stated that the government had already incurred approximately $44 million in response costs at the site and expected to incur additional costs in the future. The letter explained that as a PRP, USC could be held liable for the entire amount of response costs, and advised USC to participate in a voluntary settlement with the other PRPs. Despite the ongoing negotiations with plaintiff, USC never disclosed its EPA notification of Metamora PRP status to plaintiff, even after plaintiff's request in January 1990 that USC provide plaintiff with all the information USC had relative to USC's involvement at any Superfund Sites.

On January ˙24, 1990, Greenway attended on behalf of USC a Metamora PRP meeting, which was held to provide PRPs with information regarding the Metamora Landfill Site

and to address the possibility of an allocation of costs among the PRPs. In his deposition, Greenway admitted that USC was likely to be "one of the bigger parties" involved in the allocation process. J.A. 182. The district court concluded that Greenway was hopeful that he could negotiate an "ability to pay" settlement of USC's allocated share of the Metamora Landfill Site costs; however, no such settlement was ever worked out.

On October 12, 1990, after exchanging several proposed agreements, which contemplated that plaintiff would be buying an ongoing business, plaintiff and USC executed the Asset Purchase and Sale Agreement at issue in this case (the "Agreement"). The Agreement provided that plaintiff would purchase "all right, title and interest to all of the tangible and intangible assets which comprise [USC's] Business operations; excluding only cash on hand and in banks, trade and employee receivables, the Company name, officer life insurance policies, and the real estate located in St. Clair County or the proceeds therefrom." J.A. 539. Plaintiff gave consideration of $720,000, payable over fifteen years, plus the assumption of hazardous waste contamination cleanup liability on the Calahan Property. The Agreement expressly provided that plaintiff's assumption of hazardous waste contamination liabilities was limited to those connected with the Calahan Property.[3] The closing was placed in escrow, subject to a transfer to plaintiff of USC's RCRA permit for the Calahan facility. On the same date the Agreement was executed, plaintiff submitted to the EPA a revised RCRA permit application, to notify the EPA of the change in ownership and operational control of the Calahan facility and to obtain a transfer of USC's RCRA permit. The EPA approved the transfer on November 7, 1990.

In March 1991, following the execution of the Agreement, representatives of some of the Metamora PRPs contacted plaintiff and informed it that because of plaintiff's purchase of USC, the Metamora PRPs would be looking to plaintiff to pay USC's exposure at the Metamora Landfill Site. On April 17, 1991, an Allocation Consultant retained by the Metamora PRP group submitted to it an Allocation Report, which allocated a percentage of waste and dollar value to each of the PRPs at the Metamora Landfill Site. The Allocation Report allocated USC a minimum share of the Metamora cleanup costs in the amount of $5.3 million, based upon 100% PRP participation. It is the liability for this $5.3 million that a group of defendants referred to as the Metamora Settling Defendants[4] sought to impose on plaintiff.

By letter dated April 10, 1991, plaintiff notified USC of its intent to rescind the Agreement. The letter stated as follows:

The legal basis for rescission includes, but is not limited to, a mutual mistake between the parties relating to City Environmental being pursued for successor liability. As you know, it was the express intent of the parties that City Environmental not assume the liabilities of U.S. Chemical. The transaction between the two companies was mutually structured as a limited asset purchase agreement, to achieve that intent. Each party understood and believed that

3. Section 3 of the Agreement provided as follows:

  3. *Liabilities*
     A. *Assumed Liabilities. The only liabilities assumed by Buyer are as follows:*
       i. Any contamination cleanup liability relating to or resulting from the Real Property [i.e., the Calahan Property] acquired by Buyer....
     B. *Liabilities Not Assumed.* Buyer shall *not* assume any liability other than those liabilities specifically described above in this Paragraph 3. Without limiting the generality of the foregoing statement and limitation, Buyer shall not assume, and Company shall retain and be responsible for, the following liabilities and obligations of Company: ... (13) any CERCLA or other environmental liabilities of any nature

with respect to the cleanup of any real property, sites or other facilities to which the Company transported hazardous or other waste at any time prior to the Closing, or with which the Company was otherwise involved at any time for any reason, except only for the Real Property as provided above.
J.A. 544–46.

4. The Metamora Settling Defendants include General Motors Corporation; Sea Ray Boats, Incorporated; Chrysler Corporation; Ford Motor Company; BASF Corporation (Inmont); Reichhold Chemicals, Inc.; Acme Quality Paints Company; Foamseal, Incorporated; Hoover Universal, Incorporated; and Allied–Signal Incorporated.

any environmental liability such as Metamora, would remain with U.S. Chemical. J.A. 615. USC rejected plaintiff's rescission on May 6, 1991. On June 7, 1991, plaintiff and USC entered into an Escrow Agreement under which all monies due under the Agreement would be paid into escrow pending resolution of the successor liability issue.

From October 12, 1990, until June 30, 1992, plaintiff continuously operated the Calahan facility. Although plaintiff did not acquire USC's name, plaintiff sent out a letter in November 1990 advising USC's former customers that plaintiff had acquired "substantially all of the assets" of USC, and that USC's business "will continue to operate at 29163 Calahan, Roseville, MI 48066 under the name of City Environmental, Inc.—Calahan Facility." J.A. 613. Plaintiff continued to service USC's former customers without interruption. All but one of USC's non-management employees were rehired under plaintiff's existing job classifications and pay scales. However, there was no commonality of management between USC and plaintiff. Neither of USC's key managers, Greenway and Coraci, was retained as an employee of plaintiff, although Greenway provided consulting services for a 60–day period. Further, none of USC's shareholders, officers, or directors have ever been shareholders, officers, or directors of plaintiff; nor have any of the shareholders, officers, or directors of plaintiff ever been shareholders, officers, or directors of USC. On June 30, 1992, plaintiff suspended operations at the Calahan facility so that it could develop a coherent plan to deal with the environmental cleanup on the Calahan property and upgrade equipment to bring the facility into compliance with the law and to meet the needs of the marketplace.

USC did not liquidate or dissolve following the execution of the Agreement on October 12, 1990. It has not conducted any kind of business other than collecting accounts receivable and defending claims against it. Greenway stated in his deposition that USC has formulated a liquidation plan, pursuant to which USC's remaining assets will be distributed to creditors in satisfaction of any and all existing liabilities. USC presently has assets worth approximately $1.1 million, but it no longer has any employees, machinery, equipment, or customers.

### B.

On September 18, 1991, plaintiff City Environmental, Inc. instituted this action against 21 corporations, including USC, as well as USC's sole shareholders, Greenway and Coraci. In Count I of plaintiff's four-count amended complaint, plaintiff sought a declaratory judgment that plaintiff, as the purchaser of the assets of USC, was not liable as a successor corporation to USC for any of USC's CERCLA or other off-site environmental liabilities arising from USC's pre-sale disposal of hazardous waste at several landfills. In Count II, plaintiff alternatively sought a declaratory judgment that if the district court determined that plaintiff was the successor corporation to USC, its liability would be limited to the value of the assets actually received from USC. Counts III and IV of plaintiff's amended complaint are not involved in this appeal. The Metamora Settling Defendants[5] filed a counterclaim seeking a declaratory judgment that plaintiff is fully and completely liable as a successor corporation to USC for USC's potential CERCLA liability relating to the Metamora Landfill Site.

After extensive discovery, plaintiff and three groups of corporate defendants, namely, the Metamora Settling Defendants, the Navistar Defendants,[6] and the Peripheral Defendants,[7] simultaneously filed motions for summary judgment on the issue of whether plaintiff had successor liability for USC's environmental obligations. Following oral ar-

---

5. See *supra* note 4 for a list of the parties comprising the Metamora Settling Defendants.

6. The Navistar Defendants include Navistar International Transportation Corporation; Eaton Corporation; Wacker Silicones Corporation; and Dana Corporation.

7. The Peripheral Defendants include Dow Corning Corporation; The Upjohn Company; and Grimes Aerospace Company, as successor-in-interest to Midland–Ross Corporation.

gument on January 21, 1993, the district court granted plaintiff's motion and denied the motions filed by the three groups of defendants. In its February 5, 1993 opinion and order, the district court held that plaintiff did not have successor liability for USC's environmental obligations under any exception to the general rule that a corporate purchaser of another corporation's assets does not become liable for the selling corporation's liabilities. 814 F.Supp. 624. This timely appeal by the Metamora Settling Defendants and the Peripheral Defendants followed.[8]

## II.

### A.

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, deposition, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988). This court reviews a district court's grant of summary judgment de novo. *Brooks v. American Broadcasting Cos.*, 932 F.2d 495, 500 (6th Cir.1991). On appeal, we must consider all facts and inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). We are guided by this court's decision in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). With these general principles in mind, we now turn to the substantive law governing plaintiff's claims.

Defendants[9] argue that the district court erred in determining that plaintiff is not liable as a successor for USC's CERCLA liabilities. CERCLA § 107(a) imposes liability for response costs arising from actual or threatened releases of hazardous substances upon four classes of "covered persons:" (1) current owners or operators of a facility at which hazardous substances were disposed; (2) any person who owned or operated a facility at the time of disposal of a hazardous substance; (3) any person who arranged for disposal, or arranged for transport for disposal, of a hazardous substance at a facility, also known as "generators;" and (4) any person who accepted hazardous substances for transport for disposal at a facility, also known as "transporters." *See* 42 U.S.C. § 9607(a)(1)-(4). This court has held that the term "person," within the meaning of CERCLA § 107(a), includes successor corporations. *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1247 (6th Cir.1991).

As the district court held and all parties to this appeal acknowledge, the liability of a successor corporation for CERCLA obligations is determined by reference to state corporation law, rather than federal common law. *See Anspec*, 922 F.2d at 1247. In *Anspec*, we held that a state's law on corporations, including that state's law on mergers and successor liability, applied in determining whether a successor corporation would be liable under CERCLA for cleanup costs. *Id.* at 1246. In this case, because both plaintiff and USC were incorporated under Michigan law, Michigan corporation law governs in determining whether successor liability exists.

Defendants do not challenge the district court's conclusion that under Michigan law, a purchaser of substantially all of a corporation's assets, which then operates the seller's business as a continuing enterprise, may be liable as a successor for the seller's CERCLA liabilities. However, they assert that the

---

8. The Metamora Settling Defendants and the Peripheral Defendants originally filed separate appeals, designated as Case Nos. 93–1348 and 93–1396, respectively. Although the appeals were not consolidated for purposes of briefing, they were consolidated for purposes of submission pursuant to this Court's order of July 30, 1993.

9. Hereinafter, when referring to parties to this appeal, "defendants" shall refer to both the Metamora Settling Defendants and the Peripheral Defendants.

district court erred by including in the continuing enterprise test the requirement that there be a nexus between the purchaser and the activity giving rise to the CERCLA liabilities. Defendants contend that the district court's additional requirement is not a prerequisite to successor liability under controlling case law, and that such a requirement would defeat the broad remedial purposes of CERCLA. We review the district court's determination of issues of state law de novo. *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). Because we review the grant of summary judgment de novo and because we may affirm on any grounds supported by the record, even though they may be different from the grounds relied on by the district court, *Hilliard v. United States Postal Service,* 814 F.2d 325, 326 (6th Cir.1987), we shall first consider under what circumstances a purchasing corporation which operates as a continuing enterprise may be liable for the selling corporation's liabilities.

■■■ Michigan follows the universally-accepted general rule that a corporation that purchases the assets of another corporation does not, simply by virtue of the asset purchase transaction, become liable for the obligations of the seller. *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873, 878 n. 3 (1976); *Pelc v. Bendix Mach. Tool Corp.,* 111 Mich.App. 343, 314 N.W.2d 614, 617–18 (1981). However, the general rule is subject to four exceptions where successor liability may attach: (1) where the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liabilities; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a mere continuation of the selling corporation; and (4) where the transaction is entered into fraudulently, in order to escape liability for the obligations of the selling corporation. *Turner,* 244 N.W.2d at 886 (citing 19 Am. Jur.2d *Corporations* § 1546); *Antiphon, Inc. v. LEP Transp., Inc.,* 183 Mich.App. 377, 454 N.W.2d 222, 224–25 (1990). The traditional "mere continuation" exception to the general rule of purchaser nonliability "encompass[es] the situation where one corporation sells its assets to another corporation with the same

people owning both corporations." *Turner,* 244 N.W.2d at 892. However, in *Turner,* a products liability case that arose subsequent to the sale of corporate assets for cash, the Michigan Supreme Court expanded the mere continuation exception to situations where there was no common identity of ownership. *Id.* at 879.

■■■ *Turner* involved an injury that was allegedly caused by a negligently designed power press manufactured by T.W. & C.B. Sheridan Company ("Old Sheridan"). *Id.* at 875. Prior to the plaintiff's injury, Old Sheridan had sold its entire business, goodwill, name, and assets to Harris–Intertype Corporation ("Harris"), which expressly assumed all known liabilities of Old Sheridan. Old Sheridan changed its name to Nadirehs (Sheridan spelled backwards) and was then dissolved with the proceeds of the sale being distributed to its shareholders. Harris transferred the assets acquired to its newly created subsidiary named T.W. & C.B. Sheridan Company ("New Sheridan"), which subsequently merged into, and became the Sheridan Division of Harris.

The plaintiff sued Harris and New Sheridan, alleging successor liability for the negligence of Old Sheridan. The defendants admitted that the transfer was intended to ensure "continuity in the eyes of the public" between Old Sheridan and New Sheridan. *Id.* at 877. However, the defendants argued that they were not liable for the plaintiff's injury because they were not involved in the manufacture, sale, or distribution of the machine that caused the plaintiff's injuries and because the transaction was structured as a sale rather than a merger.

The Michigan Supreme Court, reversing a summary judgment for the defendants, acknowledged the general rule of nonliability under corporation law but emphasized that "[t]his case is a products liability case first and foremost." *Id.* at 877. "[C]ase law that developed to protect the rights of creditors and minority shareholder[s], in all probability is not applicable to meeting the substantially different problems associated with products liability torts." *Id.* at 878. The court held that the problem must be "decided on prod-

ucts liability principles rather than simply by reexamining and adjusting corporate law principles" because, in a products liability case, there is no reason to treat a purchase of assets for cash any different from a de facto merger. *Id.* at 879–80. Accordingly, the court refused to draw such distinctions out of a concern for providing the injured person in a products liability case some "place to turn for relief," *id.* at 878, and stated that manufacturers rather than the consumer should bear the brunt of the burden for defective products, *id.* at 881.[10] It concluded that in a products liability case, the absence of common identity of ownership should not be conclusive against a finding of successor liability. *Id.* at 880. The court went on to hold that even where there is not a common identity of ownership, successor liability may attach where there is sufficient continuity of the enterprise between the two corporations. *Id.* at 883. The following factors must be considered as guidelines in determining whether there is such continuity: (1) whether there is a continuation of the enterprise of the selling corporation, including a continuity of management, personnel, physical location, assets, and general business operations; (2) whether the selling corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and (3) whether the purchasing corporation assumes those liabilities and obligations of the selling corporation ordinarily necessary for the uninterrupted continuation of the normal business operations of the seller. *Id.* at 879, 883. This expanded rule is commonly referred to as the "substantial continuation" or "continuity of the enterprise" rule.

In sum, in a products liability case, the Michigan Supreme Court expanded the mere continuation exception to the general rule of nonliability to include cases where there is a continuity of the enterprise. However, it seems clear from the reasoning, as well as the language and architecture of the court's opinion that the expanded *Turner* exception is limited to products liability cases. *Id. passim.* Although Michigan's lower courts have applied the continuing enterprise exception in a number of other cases,[11] they have never applied the doctrine in a case where the underlying action was not grounded in products liability.[12] Because we conclude

---

10. This is consistent with the social and economic concerns behind strict products liability under the Restatement (Second) of Torts § 402A, which are "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Greenman v. Yuba Power Prods., Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1963).

11. *See Langley v. Harris Corp.,* 413 Mich. 592, 321 N.W.2d 662, 668 (1982) (holding that the corporate successor of the manufacturer of a defective product was not entitled to indemnity by an employer for injuries sustained by the plaintiff in a work-related accident); *Fenton Area Public Schools v. Sorensen–Gross Const. Co.,* 124 Mich.App. 631, 335 N.W.2d 221, 226 (1983) (determining that a successor corporation was liable for damages caused by a defective product because there was continuity of the enterprise); *Liberty Mut. Ins. Co. v. Curtis Noll Corp.,* 112 Mich.App. 182, 315 N.W.2d 890, 893–94 (1982) (concluding that the insurer of the designer of a defective product was not entitled to indemnity by the designer's prior owner because there is no right to indemnity between successor owners); *Pelc v. Bendix Mach. Tool Corp.,* 111 Mich.App. 343, 314 N.W.2d 614, 619 (1981) (determining that a successor corporation was not liable for damages resulting from the operation of a defec-

tive product where the totality of the transaction did not demonstrate a continuity of the enterprise); *Lemire v. Garrard Drugs,* 95 Mich.App. 520, 291 N.W.2d 103, 105 (1980) (concluding that a drug store and its proprietors cannot be liable as a continuing enterprise because the doctrine deals only with corporate enterprises); *Powers v. Baker–Perkins, Inc.,* 92 Mich.App. 645, 285 N.W.2d 402, 413 (1979) (holding a successor corporation liable for damages resulting from the failure to give a warning because there was a continuity of the enterprise); *Haney v. Bendix Corp.,* 88 Mich.App. 747, 279 N.W.2d 544, 546 (1979) (holding transferee corporation liable for defective product because there was sufficient continuity of the enterprise).

12. Two district courts in this circuit have erroneously applied the continuing enterprise theory in a CERCLA context. *See Charter Township of Oshtemo v. American Cyanamid Co.,* No. 1:92:CV:843, 1994 U.S. Dist. LEXIS 2158 (W.D. Mich. Jan. 12, 1994) (applying the continuity of the enterprise theory to determine successor liability in a CERCLA case); *United States v. Distler,* 741 F.Supp. 637, 643 (W.D.Ky.1990) (concluding that the "reasons supporting [the continuing enterprise] theory's application in products liability cases are equally applicable in the current [CERCLA] context."). Neither of these decisions is applicable here. *Charter Township* relied exclusively on the authority of *City Envtl.,*

that the Michigan Supreme Court intended that the continuing enterprise exception be limited to products liability cases, *Turner* is inapplicable to this case. Accordingly, we hold that it was error for the district court to apply Michigan's continuing enterprise exception in this case, and therefore we need not address defendants' argument that the district court erroneously grafted a nexus requirement to that exception. However, we hold that, because the continuing enterprise exception does not apply in this CERCLA case, the district court's grant of summary judgment was proper.

Defendants argue that the district court misread *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), which the district court credited as being the source of the continuing enterprise rule. Although that case may have been the genesis of the continuity of the enterprise doctrine, the district court's reliance on *Golden State* was misplaced. In *Golden State*, the issue was "whether the bona fide purchaser of a business, who acquires and continues the business with knowledge that his predecessor has committed an unfair labor practice in the discharge of an employee, may be ordered by the National Labor Relations Board to reinstate the employee with backpay." *Id.* at 170, 94 S.Ct. at 418. The Court was not attempting to define or create a continuity of the enterprise rule; rather, it was determining whether the issuance of a reinstatement and backpay order against a bona fide successor exceeded the National Labor Relations Board's ("NLRB") remedial power under § 10(c) of the National Labor Relations Act, which authorized the NLRB to take affirmative action in response to unfair labor practices. *Id.* at 175, 94 S.Ct. at 420–21. Thus, *Golden State* was decided based on an interpretation of federal law, and the Court did not, as we must do in this

CERCLA action, look to the state's corporation law for a resolution of a successor liability issue. Furthermore, the Michigan Supreme Court did not rely in any way on *Golden State* in crafting Michigan's continuing enterprise exception to the general rule of nonliability of successor corporations. *See Turner*, 244 N.W.2d at 881–82.

Defendants also contend that the district court misapplied *United States v. Mexico Feed and Seed Co.*, 980 F.2d 478 (8th Cir. 1992). In *Mexico Feed*, the Eighth Circuit determined that the continuity of the enterprise test applied in that circuit in determining successor liability in CERCLA actions. However, in *Mexico Feed*, the court stated:

> The issue of whether federal or state law should be used in analyzing successor liability was not raised by the parties and we do not decide it. However, considering the national application of CERCLA and fairness to similarly situated parties, the district court was probably correct in applying federal law.

*Mexico Feed*, 980 F.2d at 487 n. 9. Accordingly, as *Mexico Feed* was decided by applying federal law rather than state law, it is clearly inapplicable to this case. As earlier stated, we have determined that in this circuit state law governs in determining successor liability in CERCLA actions. *See Anspec*, 922 F.2d at 1247.

## B.

■ The Metamora Settling Defendants argue that the district court erred in concluding as a matter of law that the transfer in question was not fraudulent under Michigan's Fraudulent Conveyance Act. As an initial matter, the Metamora Settling Defendants assert that, because plaintiff pled that it did not engage in a fraudulent transfer as part of its declaratory judgment claim, the

*Inc. v. U.S. Chemical Co.*, 814 F.Supp. 624, 638 (E.D.Mich.1993), which we now determine was incorrectly decided. *Distler*, which was attempting to create a uniform federal rule, was decided the year before this court ruled that state corporation law governs in determining successor liability under CERCLA. *See Anspec*, 922 F.2d at 1246–47; *see also Grand Labs., Inc. v. Midcon Labs of Iowa*, 32 F.3d 1277, 1283 (8th Cir.1994) (refusing to apply the "continuity of enterprise

exception" and stating that in those jurisdictions where the exception is recognized, it "applies only in the products liability context"); *B.F. Goodrich Co. v. Murtha*, 840 F.Supp. 180, 185 (D.Conn.1993) (refusing to impose successor liability in a CERCLA case based on the authority of *Turner*); *Sylvester Bros. Dev. Co. v. Burlington N. R.R.*, 772 F.Supp. 443, 449 (D. Minn.1990) (declining to adopt the continuing enterprise theory in a CERCLA case).

district court erred in concluding that the Metamora Settling Defendants had the burden of proving that the transaction was fraudulent. Under Michigan's Fraudulent Conveyance Act, the party alleging fraud must prove the existence of fraud by clear and convincing evidence. *United States v. Rode,* 749 F.Supp. 1483, 1493 (W.D. Mich. 1990), *aff'd,* 943 F.2d 53 (6th Cir.1991); *see also Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989) (stating that if a party's case requires proof of an element by clear and convincing evidence, then that burden must be met by that party at the summary judgment stage to avoid dismissal). However, to avoid dismissal, the party alleging fraud need only show that the consideration given was inadequate. *Mason v. Mason,* 296 Mich. 622, 296 N.W. 703, 705 (1941). Accordingly, the district court properly placed on the Metamora Settling Defendants the burden of showing that the conveyance was made without fair consideration.

■ The Metamora Settling Defendants assert that the transfer of assets from USC to plaintiff was fraudulent under the constructive fraud provisions of Michigan's Fraudulent Conveyance Act. *See* M.C.L. §§ 566.15, 566.16.[13] Both of the constructive fraud provisions require that the party claiming fraud show that the conveyance was made "without fair consideration." *Id.* at §§ 566.15, 566.16; *Otte v. Landy,* 143 F.Supp. 893, 898 (E.D.Mich.1956), *aff'd,* 256 F.2d 112 (6th Cir.1958). Michigan's Fraudulent Conveyance Act, which is taken from the Uniform Fraudulent Conveyance Act, provides, "Fair consideration is given for property ... [w]hen in exchange for such property, ... as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied." M.C.L. § 566.13(a). Under this provision of the uniform law, "fair equivalent" does not mean exact equivalent in terms of nominal value. *John Ownbey Co. v. Commissioner,* 645 F.2d 540, 545 (6th Cir. 1981). Instead, courts look "at all the surrounding circumstances to determine whether the transaction was fair." *Id.*

In this case, the district court found that fair consideration was paid, and thus, the transaction was not a fraudulent conveyance. In the words of the district court, there is "voluminous" evidence of record supporting the conclusion that fair consideration was paid. J.A. 167. Plaintiff valued the assets at no more than $1 million at the time it actually entered into the Agreement. In exchange for these assets, plaintiff agreed to pay $720,-000 over fifteen years and fully assume all liability for hazardous waste contamination cleanup on the Calahan Property. Plaintiff did not know exactly what that liability would be, but it estimated the liability at $1 million to $5 million based on preliminary findings from its environmental consultants. Furthermore, there is no indication that USC's remaining assets are less than what the company was worth at the time of the sale. Based on this evidence and the surrounding circumstances, we agree with the district court's conclusion that plaintiff gave fair consideration.

■ The Metamora Settling Defendants also assert that the district court improperly decided genuine issues of material fact, including the reason for the lower purchase price, in considering the summary judgment motions. The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). The Metamora Settling Defendants point to the fact that plaintiff initially valued USC's assets at over $3 million, yet the final purchase price was only $720,000. They focus their argument on "the reason for the continually decreasing purchase price," Appellant's Brief at 40, and argue that there was a

---

**13.** The Metamora Settling Defendants have not asserted a claim based on actual fraud. *See* M.C.L. § 566.17.

genuine issue as to whether the transaction was fraudulent as a result of plaintiff's desire to adjust the price to take into account the substantial off-site liabilities. There is no evidence, other than the Metamora Settling Defendants' bare contentions, that the adjustment of the purchase price was made for off-site CERCLA liabilities. In addition, where the claim is based on constructive, rather than actual fraud, the proper inquiry is whether the price actually paid was fair consideration in light of all the facts and circumstances, not whether there is sufficient evidence to support a finding of actual fraud. The fact that negotiations took place to arrive at a fairer valuation is not significantly probative on the issue of whether the actual price paid was fair consideration. Accordingly, we hold that the district court did not err in granting summary judgment for plaintiff on the fraudulent conveyance claim because there was no genuine issue of material fact as to whether the consideration was fair.

### C.

Finally, the Metamora Settling Defendants argue that the district court erred in failing to consider defendant's argument that plaintiff impliedly assumed responsibility for USC's off-site liabilities. The district court refused to consider this argument because it concluded the argument was not briefed. As a general rule, this court declines to consider in the first instance arguments not raised in the district court. *E.g., Taft Broadcasting Co. v. United States,* 929 F.2d 240, 243 (6th Cir.1991). However, this court has, in limited circumstances, considered issues not passed on below where injustice might otherwise result, *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 477 (6th Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990), or where the issue presents only a question of law, *Black Motor Co. v. Commissioner,* 125 F.2d 977, 980 (6th Cir.1942). Because it appears that the implied assumption argument was actually raised below, even though it was not pressed at trial, and the issue presents only a question of law, we shall consider the issue here.

First, the Metamora Settling Defendants argue that plaintiff's express disclaimer of liability for USC's off-site CERCLA liabilities is unenforceable as a matter of law as against the Metamora Settling Defendants. They contend that CERCLA § 107 precludes persons liable under CERCLA from contractually relieving themselves of liability with respect to third parties. CERCLA § 107 provides in relevant part:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1) (emphasis added). In *Niecko v. Emro Marketing Co.,* 973 F.2d 1296 (6th Cir.1992), this court analyzed CERCLA § 107: "[T]he first sentence provides that all parties involved are to be jointly and severally liable to the claimant under the statute. Where the claimant is the government, liability may not be transferred. However, as between the parties allegedly responsible . . . liability may indeed be transferred." *Niecko,* 973 F.2d at 1300–01. Such an interpretation is not inconsistent with the underlying purpose of CERCLA § 107, which "is to ensure that responsible parties will pay for the cleanup and that they may not avoid liability to the government by transferring this liability to another." *AM Int'l, Inc. v. International Forging Equip. Corp.,* 982 F.2d 989, 994 (6th Cir.1993) (citing *Niecko,* 973 F.2d at 1300–01). However, as the underlined language in the statute indicates, CERCLA § 107's prohibition on the transfer of liability presupposes that the purported transferor of responsibility already bears responsibility for the liability. Thus, CERCLA § 107 only applies to prevent one who is already a responsible party from avoiding liability altogether; it does not make one a responsible party. Accordingly, we conclude that CERCLA § 107 is inapplicable in this case because there is no inde-

**256**

pendent basis on which plaintiff is responsible under CERCLA for USC's CERCLA obligations.

Second, the Metamora Settling Defendants argue that, regardless of the express disclaimer in the Agreement, plaintiff impliedly assumed USC's CERCLA obligations because plaintiff requested information from USC about such liability. Under Michigan law, one corporation does not impliedly assume liabilities of another corporation merely because the corporation has acquired the assets of that corporation. *Oak Distributing Co. v. Miller Brewing Co.*, 370 F.Supp. 889, 903–04 (E.D.Mich.1973) (citing *Clark v. Detroit Curling Club*, 298 Mich. 339, 299 N.W. 99, 100 (1941)). Instead, there must be an intent of the parties that liabilities be assumed. *See id.; John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 406–07 (1st Cir.1993) (holding that to transfer CERCLA liability, an agreement must contain language broad enough that it evidences an intent to transfer environmental liability). In this case, the Agreement expressly provided that plaintiff's assumption of hazardous waste contamination liabilities was limited to those connected with the Calahan Property. In the face of contractual language that expressly disclaims liability, we cannot find that there was an implied assumption of liability, and we need not consider the argument that plaintiff's conduct manifested an intent to assume such liability.

### III.

For the reasons stated, the district court's grant of summary judgment is AFFIRMED.