**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0135n.06
Filed: February 17, 2009

**No. 07-2293**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOHN HARDY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| REYNOLDS & REYNOLDS COMPANY, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

Before: MARTIN, BATCHELDER, and DAUGHTREY, Circuit Judges.

**PER CURIAM.** In this diversity contract action, plaintiff John Hardy challenges the ruling of the district court granting summary judgment to his former employer, Reynolds & Reynolds Company. Because the sales commission agreement between the parties gives Reynolds & Reynolds the discretion to modify it, and because Hardy was not responsible for procuring the contested sale through his individual efforts as required by the agreement, we conclude that the district court properly resolved the issue before it. In addition, we hold that the choice-of-law question raised by the plaintiff for the first time on appeal has been waived. We therefore affirm the judgment of the district court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On December 3, 2004, plaintiff John Hardy was hired as an account executive for the defendant, Reynolds & Reynolds Company, a company that sells software and information technology services to retail automobile dealers. Reynolds & Reynolds has its headquarters in Dayton, Ohio, but Hardy was assigned to the General Motors account in Detroit and worked in Michigan. Prior to beginning his employment, Hardy signed a "Sales Representative and Associate Agreement," which provided that Ohio law would govern the agreement and choice of venue and jurisdiction would be in the Ohio courts. The agreement also provided that the "[e]mployee shall be entitled to compensation according to the formula, method or system described in the then-current compensation plan including the provisions of such plan applicable upon transfer or termination as such plan may change from time to time." (Descriptions of sales representative compensation plans were made available on the company's intranet site.)

Prior to Hardy's hiring, Reynolds & Reynolds had been working on a proposal to provide an Integrated Dealer Management System (IDMS) for General Motors dealers. As a result of these efforts, Reynolds & Reynolds received a formal Request for Proposal in January 2005, not long after Hardy was hired. Reynolds & Reynolds management created a team of employees to respond to the GM request for a proposal. Hardy was not a part of this team, nor was he included in the conference calls and meetings involved in preparing the proposal. Hardy's role in the process was simply to serve as a "point person"

to submit questions to General Motors. He continued to serve in this capacity after the proposal was submitted to General Motors, but he did not participate in the contract negotiations with General Motors to finalize the transaction. Hardy was, however, listed as a "key person" on the contract. The personal sales plan that Hardy developed in November 2005 for the 2006 fiscal year did not include the IDMS deal with General Motors. The IDMS contract with General Motors was announced to Reynolds & Reynolds employees on December 16, 2005, and had a value of $260 million over seven years.

After the contract was finalized, on January 9, 2006, Hardy received a letter awarding him a $43,000 cash and stock bonus for his participation in the IDMS transaction. The letter stated:

> Since deals this large are unanticipated when establishing your annual compensation plan, no credit will be provided through your standard compensation program. However, the following cash and stock are intended to reward you for your outstanding efforts.

Had Hardy been granted a commission on the IDMS deal according to his variable compensation plan, he would have received $2,283,750.

Hardy filed a complaint in the Eastern District of Michigan in March 2006, alleging breach of contract and breach of the Michigan Sales Representatives' Commission Act, MICH. COMP. LAWS ANN. § 600.2961, with jurisdiction based on diversity grounds. Reynolds & Reynolds moved for summary judgment, and that motion was later granted based on Michigan law.

## DISCUSSION

## Standard of Review

We review a grant of summary judgment by a district court *de novo*. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In evaluating a motion for summary judgment, a court "must review all the evidence, facts, and inferences in the light most favorable to the nonmoving party." *Van Gorder v. Grand Trunk Western R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007). To defeat a motion for summary judgment, the nonmoving party must demonstrate the existence of a genuine issue of material fact. *See id.* The evidence presented by the nonmoving party must be more than a mere scintilla; it must be sufficient to allow a reasonable finder of fact to find in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### *Choice of Law*

In a diversity case, federal courts apply the conflict of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1940). Determinations of state law by federal district courts are to be reviewed *de novo* by courts of appeals. *See Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991). Because this lawsuit was filed

in federal court in Michigan, we look first to Michigan state law. Michigan's choice of law rules "require a court to balance the expectations of the parties to a contract with the interests of the states involved to determine which state's law to apply." *Equitable Life Assurance Soc'y of the United States v. Poe*, 143 F.3d 1013, 1016 (6th Cir.1998). The Supreme Court of Michigan has followed the approach of the Restatement (Second) of Conflict of Laws, §§ 187-188 in striking this balance. *See Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 701, 704-06 (6th Cir. 2002). According to the Restatement, the law of the state selected by the parties generally controls, unless there is no substantial connection between the contract and the state or the parties' choice of law would violate a fundamental policy of the state law which would have governed in the absence of the parties' choice. *See Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999).

Here, the parties agreed in the Sales Representative and Associate Agreement that "[t]he laws of the State of Ohio shall govern all questions relative to the interpretation and construction of this Agreement." Michigan state courts generally favor enforcing contractual provisions regarding the choice of law, which in this case would seem to weigh in favor of applying Ohio law. *See Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006). However, the plaintiff sued under a specific Michigan statute, and neither party raised the choice of law provision at the district court level. As a result, the district court judge relied on Michigan law without objection. Both parties relied primarily on Michigan law in their briefs supporting or opposing summary judgment; neither party

raised or cited Ohio law. Accordingly, the defendant argues that the choice of law issue was waived by the plaintiff in the district court, and because it was not asserted at the district court level, the issue is waived on appeal.[1]

As a general rule, we decline to consider arguments that were not previously raised in the district court. *See*, *e.g.*, *City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 255 (6th Cir. 1994). However, there are recognized exceptions to this general rule, permitting review of arguments not previously raised if they are pure questions of law, or "where injustice might otherwise result." *Id.* In granting this exception, we have tended to view more favorably arguments that have been raised in substance, although not explicitly. *See id.* (addressing an issue on appeal that was "actually raised . . . [but] not pressed at trial");

---

[1]In so arguing, the defendant relies on an unpublished Sixth Circuit decision, *Golumbia v. The Prudential Ins. Co.*, No. 96-1521, 1997 WL 345728 (6th Cir. June 20, 1997). Golumbia involved an insurance contract which expressly stated that New York law was to govern the policy. Because the plaintiff's attorney "represented to the district court that Michigan law controls," the panel treated the issue as waived, and did not allow the plaintiff to raise the choice of law provision on appeal. *See id.* at *2. In reaching this conclusion, the panel relied on two cases from the Seventh Circuit, only one of which squarely addressed the issue of acquiescence to the application of state law at the district court level. The first case, *Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230 (7th Cir. 1985), addresses an attempt to raise the issue of choice of state law "at a late point in . . . litigation" after the parties had "acquiesced" to the choice of New York law. *Id.* at 1231 n.1. The other, *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir. 1996), addresses choice of law in the international context and the requirement of Fed. R. Civ. P. 44.1 to give adequate notice before raising an issue of foreign law, which is not directly applicable to the issue in this case. Although there is little case law from our own circuit directly addressing this issue, and *Golumbia* seems to rely partly on an inapplicable case from another circuit, its approach appears reasonable and is in accord with the general contract principle that the parties can consent to the choice of law.

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 360 n.9 (6th Cir. 1998) ("Though their arguments could have been presented more clearly to the district court, we nevertheless believe the parties' briefs placed before the district court the validity of the policy under the overbreadth doctrine.").

In the present case, we have no indication from the record that the parties raised, or attempted to raise, the choice of law provision in the Sales Representative and Associate Agreement at the district court level. Although the determination of which state law should govern this agreement is a question of law, there are no other factors that would weigh in favor of departing from the general rule and considering the choice of law provision for the first time on appeal: (1) there do not appear to be indications that the parties attempted to present the issue but did not do so clearly or forcefully enough, as in *City Management* or *United Food & Commercial Workers*; (2) it does not appear that injustice would otherwise result if Michigan, rather than Ohio, law is applied; (3) the general principles of contract interpretation that would apply in interpreting the Sales Representative and Associate Agreement do not significantly differ from Ohio to Michigan, *compare Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 904 (6th Cir. 2006) ("contract language is ambiguous only if it is susceptible of two conflicting but *reasonable* interpretations") (stating Ohio law) (internal quotation omitted) *with Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d, 535, 544 (6th Cir. 2007) ("A contract is ambiguous if its words may *reasonably* be understood in different ways.") (stating Michigan law) (internal quotation omitted); and (4) the choice of law decision would

not impair plaintiff's ability to bring a claim under the Michigan Sales Representatives' Commission Act (SRCA), *see Howting-Robinson Assocs., Inc. v. Bryan Custom Plastics*, 65 F.Supp.2d 610, 613 (E.D. Mich. 1999) (applying SRCA in a sales commission dispute despite the contract's Ohio choice of law provision). Given these circumstances, we see no compelling reason to consider the choice-of-law issue for the first time on appeal.

**Contract Dispute**

Hardy signed a Sales Representative and Associate Agreement prior to beginning his employment with Reynolds & Reynolds. While this agreement did not detail the compensation that Hardy was to receive from Reynolds & Reynolds, it did state that "Employee shall be entitled to compensation according to the formula, method or system described in the then-current compensation plan . . . as such plan shall change from time to time." The contract also stated that "[t]he specific services performed by Employee, the place of their performance, and Employee's title may be modified in any way at any time in Reynolds' sole discretion."

The sales representative compensation plans for the 2005 and 2006 fiscal years were available to Reynolds & Reynolds employees on the company's intranet. These documents provided:

> Because of unusual circumstances or any other condition, Sales Management and/or Sales Compensation Management reserve the right to suspend or change the application of this compensation plan in selected

individual situations.  This means, in some cases, compensation may be arbitrarily determined without regard for the specific details of this plan.

The compensation plans also required sales representatives to submit requests for adjustments in their credit for sales made to the company, in writing, within 90 days of the completion of the transaction.

Hardy was paid an initial base salary of $110,000 per year, with additional variable compensation to be based on the compensation plan in effect for that fiscal year.  For the 2006 fiscal year (beginning on October 1, 2005 and ending September 30, 2006) Hardy's variable compensation was to be based on three different scales, one of which was to be calculated based on how much of the employee's annual sales goal had been met. Hardy's annual sales goal for the 2006 fiscal year (set in November 2005) was five million dollars, and this goal did not include the much larger GM-IDMS contract.  The document that describes the compensation plan also states that additional payments to employees, essentially sales commissions, will be  "[b]ased on INDIVIDUAL performance." (Emphasis in original.)

**Breach of Contract Claim**

Plaintiff's breach of contract claim depends on the interpretation accorded the Sales Representative and Associate Agreement and compensation plan documents referenced by the agreement.  The plaintiff argues that the agreement is "sparsely worded" and that, based on prior company practice, Hardy should be entitled to receive a percentage of the

IDMS deal according to his compensation formula. Hardy claims that it was company practice to pay "incentive compensation on any sales contracts received from General Motors, not just orders which he procured," so he should receive compensation for the IDMS deal as well. He also notes that after his lawsuit was filed, the compensation plans for the 2007 fiscal year were changed so that they specifically define "individual performance" for the first time and add explicit limits for compensation for employees involved in "large deals."

Under Michigan law, however, before we can look to extrinsic evidence, such as the course of dealing between the parties, we look to the intent of the parties as expressed by the plain language of the contract's terms. *See Certified Restoration Dry Cleaning*, 511 F.3d at 543. If the contract terms are not ambiguous, that is, if they do not allow reasonable conflicting interpretations, then the court enforces the contract's terms as the parties expressed them. *See id.* at 544. Extrinsic evidence is not considered unless the terms are ambiguous. *See id.* When reading contractual provisions, we must "give[] the words their plain and ordinary meanings." *Id.* (quoting *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 543 (Mich. Ct. App. 2007)).

Looking at the agreement between the parties, we see that the compensation formula, although not extremely detailed, intended that Hardy's variable compensation was to be calculated based on his individual performance. The district court, consulting the dictionary definition of the word "individual," concluded that, "the ordinary meaning of the

words thus seems to refer to sales that, while perhaps not *exclusively* the result of an individual's efforts, in large part result from or are founded on such efforts." Given that the IDMS deal was in progress before Hardy was employed by Reynolds & Reynolds and that Hardy did not play a major role in preparing the proposal for the IDMS deal or negotiating the final contract, it does not appear that this transaction resulted in large part from Hardy's efforts. While Hardy clearly did contribute in some way to the the IDMS deal, the defendant argued in the district court that the plaintiff's annual salary already compensated him for his work on this project. From a plain reading of the words "based on individual performance," it does not follow that the plaintiff was to be compensated for a sale to which he merely contributed.

In the fiscal year following his lawsuit, as the plaintiff points out, the company revised its policies to more clearly define "individual performance" and specifically limited the commission that sales representatives could receive from "large deals." However, just because the plan was made clearer, it does not necessarily follow that the original language was ambiguous and "equally susceptible to more than a single meaning." *Mayor of Lansing v. Mich. Pub. Serv. Comm'n*, 680 N.W.2d 840, 847 (Mich. 2004). The reasonable reading of the plain meaning of the term, "Based on INDIVIDUAL performance," would not change. The reasonableness of this reading of the term can be analyzed in light of other terms in the contract, as the district court did. Considering the plaintiff's $110,000 annual salary and $5 million annual sales objective, which did not cover the IDMS deal, it would not seem reasonable that the parties intended, by this term, to

compensate the plaintiff over $2 million for a transaction that was already in progress when he joined the company and in which he did not play a leading role.

Even if we look to extrinsic evidence of the company's practice in paying incentive compensation to help explain the meaning of the individual performance term, that evidence does not appear to support plaintiff's contention that he should be paid for every sale to General Motors, regardless of his degree of participation in the sale. For instance, a Reynolds & Reynolds vice president asked to explain the meaning of the individual performance term defined it as "we pay people for what they sell." She explained that individual performance was understood in the company to mean "that you were the person who went out and got the business." She also stated that as a "team effort," the IDMS deal was not intended to be covered by the individual compensation plans.

In addition, the language of the Sales Representative and Associate Agreement and supporting documents mentioned that the employer reserved the right to modify or change the variable compensation scheme. The agreement itself mentions that the compensation plans "may change from time to time," and the "General Rules" from both the 2005 and 2006 fiscal year compensation plan documents state that the company "reserve[s] the right to suspend or change the application of this compensation plan in selected individual situations." Both documents explain that "compensation may be arbitrarily determined without regard for the specific details of this plan."

The plaintiff contends, however, that there was no language in the plaintiff's individual compensation plan that stated that Reynolds & Reynolds could change the terms at any time. The plaintiff also disputes that the language in the 2005 and 2006 compensation plans applied to him because these compensation plans do not explicitly refer to Hardy's job title, OEM Solutions Account Executive. Although the Sales Representative and Associate Agreement that Hardy signed does incorporate the terms of "the then-current compensation plan . . . *as such plan may change from time to time*." (emphasis added), in its order granting summary judgment, the district court did not find it necessary to resolve these issues.

Finally, the parties dispute the applicability of the Michigan procuring cause doctrine, which governs the liability of principals to pay commissions to their sales agents. As stated by the Michigan Supreme Court, "the agent is entitled to recover his commission whether or not he has personally concluded and completed the sale, it being sufficient if his efforts were the procuring cause of the sale." *Reed v. Kurdziel*, 89 N.W.2d 479, 483 (Mich. 1958). This doctrine applies when a sales agent's authority or employment is terminated and no explicit agreement had been reached over the payment of commissions in the event of termination. *See* Randall J. Gillary & Kevin P. Albus, *Unsupportable Limitations on Michigan's Procuring Cause Doctrine in the Case of* Roberts Associates, Inc. v. Blazer International Corp., 2004 MICH. ST. L. REV. 101, 106. Thus, in a case in which the agent did the work required to bring about a sale but is terminated before the transaction is completed, the "procuring cause" doctrine would allow the agent to be compensated for

work performed and prevent the principal from taking advantage of the agent's performance without compensating him or her.

The plaintiff contends that the agreement and other documents did not require that Hardy be the procuring cause of a sale in order to receive compensation. In fact, Hardy testified that "he was paid incentive compensation on any sales contracts received from General Motors, not just orders which he procured." He also notes that he was compensated for transactions that other sales representatives completed and, therefore, should be compensated for the IDMS transaction as well.

Under the doctrine as stated in *Reed*, Hardy would be entitled to compensation for sales that he originated and closed, and also for sales for which he was the procuring cause, even if others worked on the transaction or closed the deal. He would, consequently, be entitled to commission "on sales which were the subject or the result of discussions, negotiations, quotations, or pre-sale customer services in which the plaintiff actually participated," *Roberts Assocs., Inc. v. Blazer Int'l Corp.*, 741 F.Supp. 650, 655 (E.D. Mich. 1990), even though he did not participate in the final contract negotiations. In this case, the plaintiff claimed that he was the "most important person in securing the business" and was "in reality . . . the lead person." Although Hardy did serve as the point person for questions to be submitted to General Motors and attend meetings for the Reynolds & Reynolds team working on the proposal, he did not take any lead role in the activity leading up to the IDMS negotiations. He also did not play a role in discussions,

negotiations, quotations, or pre-sale customer service. As a result, he cannot be considered a procuring cause of the IDMS sale, and thus is not entitled to compensation on that basis.

**Sales Representatives' Commission Act Claim**

The plaintiff also raises a claim under the Michigan Sales Representatives' Commission Act, MICH. COMP. LAWS ANN. § 600.2961. The Act requires employers to pay commissions due to sales representatives within 45 days of the commission becoming due. Principals who violate the Act are liable for treble damages and attorneys' fees if they withhold or delay payment. *Id.* § 600.2961(5). This claim is derivative of the breach of contract claim, however, and if there is no liability on the contract claim for sales commissions, there is no corresponding violation of the Act.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.