enforcing that agreement, even though doing so denied AP from receiving commissions from the subsequent sales.

Likewise, well-settled law holds that the related claim of unjust enrichment also is only appropriate in the absence of an express contract. *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 939 (6th Cir. 1989). Unjust enrichment, like promissory estoppel, is not applicable when the parties are bound by an express written agreement. *Id.* In *Cloverdale*, the Sixth Circuit held that post-termination sales did not constitute unjust enrichment where the parties both received the benefit of the bargain to which they agreed.

As with AP's other claims, its equitable theories of recovery are thwarted by the fact that the written agreements between the parties unambiguously provided for the termination of the agreements and the payment of commissions.

### CONCLUSION

While it appears that AP was understandably disappointed that its business relationship with Philips did not produce the long-term commissions that it expected, it may not recover for having entered into an agreement which did not turn out as it had hoped. AP's subjective expectations were thwarted by a bad bargain, not by fraud or reliance on an oral contract. AP knowingly entered into agreements under terms it found objectionable. The two parties negotiated over the terms of the agreements, and AP signed them each year fully understanding the meaning of the agreements as they were written. The terms of the written contracts are unambiguous and clearly control the issues of termination and payment of commissions. As a matter of law, extrinsic evidence may not override the plain meaning of the agreements.

Based on the foregoing, we conclude that summary judgment was properly granted by the district court in this matter. We therefore AFFIRM.

---

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0036P (6th Cir.)
File Name: 03a0036p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

APJ ASSOCIATES, INC.,
    *Plaintiff-Appellant,*

*v.*

NORTH AMERICAN PHILIPS CORP., et al.,
    *Defendants-Appellees.*

No. 01-1915

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-74911—Avern Cohn, Senior District Judge.

Argued: December 6, 2002

Decided and Filed: January 31, 2003

Before: COLE and CLAY, Circuit Judges;
BERTELSMAN, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Michael J. Sugameli, SUGAMELI & OLSON, Troy, Michigan, for Appellant. E. Jeffrey Banchero, THE BANCHERO LAW FIRM LLP, San Francisco, California,

---

[*] The Honorable William O. Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

for Appellees.  **ON BRIEF:**  Michael J. Sugameli, Edward M. Olson, SUGAMELI & OLSON, Troy, Michigan, for Appellant.  E. Jeffrey Banchero, Robert M. Lichtman, THE BANCHERO LAW FIRM LLP, San Francisco, California, Richard A. Rossman, PEPPER, HAMILTON & SCHEETZ, Detroit, Michigan, for Appellees.

———————————

## OPINION

———————————

BERTELSMAN, District Judge.  This is an appeal of a grant of summary judgment.  Plaintiff-Appellant APJ Associates ("AP"), a manufacturer's representative firm, signed a series of agreements with Defendant-Appellee North American Philips Corp. ("Philips"), a microprocessor supplier. After Philips terminated the agreement, AP brought suit, claiming it is entitled to sales commissions due to fraudulent inducement, promissory estoppel, and the Michigan Sales Representative Act, Mich. Comp. Laws Ann. § 600.2961.  For the reasons set forth, this court AFFIRMS the district court.

### PROCEDURAL AND FACTUAL BACKGROUND

AP signed the first of the manufacturer's representative contracts with Philips in 1989. Philips, through its subsidiary Signetics, manufactured electronic components for automobile cruise control systems and wanted to become a supplier for General Motors ("GM").  Philips hired AP to develop a business relationship between Philips and GM, with the goal of eventually landing a contract to supply circuits for cruise control in GM automobiles.  Ultimately Philips did execute a contract with GM, but it also terminated its representative agreement with AP.

*The Sales Representative Agreements*

AP was a manufacturer's representative firm with a reputation for developing business relationships with several

introduced the parties.  *Id.*  Despite AP's argument that the 1992 letter formed the basis for the sales of Philips microprocessors to GM, no actual sale or purchase order was placed until 1994.

*Promissory Estoppel and Unjust Enrichment*

AP seeks the payment of commissions on the sales of microprocessors by Philips to GM, which began with the 1995 product year and continue today.  AP's equitable claim merits some sympathy.  In spite of Philips's attempts to minimize the importance of AP's role, it seems clear that the relationship between Philips and GM would never have gotten off the ground but for the efforts of AP.  However, and once again because of the express terms of the contract, AP does not have a legal claim for promissory estoppel or unjust enrichment regarding post-termination sales.

Promissory estoppel may not be used to override the express agreement of the parties contained in written agreements.  *See, e.g.*, *Martin*, 193 Mich. App. at 180.  For the court to apply promissory estoppel under Michigan law, it must find that an implied agreement exists between the parties, in the absence of an express contract. *Barber v. SMH, Inc.*, 202 Mich. App. 366 (1993).  Promissory estoppel arises in equity when (1) there is a promise (2) that the promisor should have reasonably expected to induce action (3) which in fact produces reliance or forbearance (4) under circumstances such that the promise must be enforced if injustice is to be avoided.  *Id.* at 375-76.  A claim for promissory estoppel regarding termination may not be established in the absence of a clear promise that a contract would not be terminated.  *Id.*

As has been discussed *supra*, in this case the written terms of the contract were clear, and AP understood the bargain into which it was entering.  Since the express provisions of the agreement govern the payment of commissions, that agreement controls.  Promissory estoppel based on extrinsic understandings is not appropriate.  The agreement bars post-termination commissions, and Philips is not estopped from

Not only has the Act been held explicitly not to supersede an agreement of the parties regarding payment of post-termination commissions, but the Act itself states that the parties' agreement will be held to define the scope of the obligation to pay commissions: "The terms of the contract . . . shall determine when a commission becomes due." § 600.2961(2). Since the Act, as cited by AP, only requires the payment of all commissions that become "due," it only requires that Philips have paid AP all commissions to which it was "due" at the time of termination.

The district court held that AP was indeed paid all commissions which were due at the time the agreement was terminated, effective November 1, 1992. The agreement provided that commissions were to be paid on "all sales solicited and orders received" while the agreement was in effect. Even though in early 1992 Philips had received from GM the letter in which it named Philips to design the microprocessors for its cruise control modules, that letter did not constitute a sale or a purchase of such items. It only provided Philips the chance to design a product with sales and pricing agreements to be determined later. The first purchase order from GM did not occur until 1994, well after the termination of the 1992 Agreement. While that subsequent sale was undoubtedly due in some part to AP's previous efforts, AP did receive all the commissions to which it was entitled under the contract. The failure to pay post-termination commissions did not violate the Michigan Sales Representative Act.

Furthermore, AP's role in the 1994 sales to GM, while certainly of great importance in the relationship, does not qualify as the "procuring cause" of the subsequent sales. A manufacturer's representative firm may only obtain an award as the procuring cause of post-termination sales where the written agreement is silent. *Roberts Assocs., Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 652 (E.D. Mich. 1990). Where the agent does not participate in the negotiation of a given contract of sale, the agent is not the "procuring cause" of post-termination sales, even though he may have originally

companies, including GM. An AP electrical engineer named Ron Michalak began working with GM's microprocessor unit, AC Rochester, in 1974. It was allegedly because of this contact and AP's reputation for being successful at introducing companies to GM that Philips sought AP's services.

In December 1989, AP and Philips negotiated a Sales Representative Agreement (the "1989 Agreement"). This agreement included a thirty-day termination clause: "Either party may terminate the agreement for its convenience upon at least thirty (30) days prior written notice of termination." (J.A. at 26). Addendum "C" to the 1989 Agreement set forth a schedule for commissions, which would be based on "sales solicited and orders received by customer location within REPRESENTATIVE's Territory . . . ." (J.A. at 32). The contract further provided that Philips would provide AP a budget to perform its work and would pay AP commissions on a variable rate.

In the termination clause, the 1989 Agreement stated that (unless there was a negative backlog in payments) there would be no commissions paid on post-termination sales. (J.A. at 26). The 1989 Agreement also contained an integration clause (which was also included in the subsequent agreements), stating that the written contract "constitutes the entire Agreement between the parties relative to the sales representation . . . and supercedes [sic] and replaces all prior or contemporaneous agreements, written and verbal . . . ." (J.A. at 29). The contract made no mention of any specific tasks such as introducing Philips to GM.

The 1989 Agreement only ran thirty-one days, expiring on December 31. In January 1990, the parties executed another agreement, with similar provisions, for a one-year term (the "1990 Agreement"). The 1990 Agreement provided for commissions to be paid "based on all shipments of Product made to and developmental charges paid by customers within REPRESENTATIVE'S Territory . . . ." (J.A. at 155). The

1990 Agreement contained the same thirty-day termination "for convenience" clause. (J.A. at 156).

Before signing the 1990 Agreement, AP President Jim Alexander complained to Philips's sales manager Rich Lesinski about the termination clause. Lesinski agreed to "bring it up with his superiors." (J.A. at 359). However, Philips did not allow any change in the terms of the Agreement, and Alexander signed it as written. Alexander testified that he did so, despite his objection to the termination clause, because he was told that the contract "was corporate policy and you had to accept it." (J.A. at 360). According to AP, "the representatives from Philips informed Alexander that, while the written contract came from the home office and was not negotiable, AP needn't worry because the oral agreement they negotiated was the actual agreement . . . ." AP also alleges that Alexander was told that "no sales representative of Philips was ever terminated as long as sale targets were met," and that Philips's policy was that "long-term sales equal long-term commissions."

In January 1991, the parties signed another one-year agreement. The 1991 Agreement contained a thirty-day termination clause to which Alexander objected but nonetheless signed. In January 1992, the parties executed yet another one-year agreement, again with a thirty-day termination clause. The 1992 Agreement changed the way commissions would be paid: it substituted a flat commission rate for the previous system of a variable commission rate and a budget. Alexander again objected to the termination clause but was told it was not negotiable. Alexander declined to bring the matter up with senior officials at Philips, testifying that "it was not a politically correct thing to do." (J.A. at 369).

*AP's Work and Termination*

In March 1990, AP arranged a meeting with representatives of Philips and GM. According to AP, Ron Michalak dedicated about one and one-half days per week to the project. Throughout 1990, AP continued to arrange meetings and generally acted as the liaison between Philips and GM. On

Philips, which serves as the only evidence of such program or policy by Philips, is ambiguous. It does not establish that Philips had a clear policy for taking all large accounts in-house in order to deny its representative firms the fruits of their labor, but only that it made decisions on a case-by-case basis. (J.A. 508-09).

As the district court observed, even if the program functioned as AP alleges, it still does not show that AP was fraudulently induced into entering the agreements, because AP was well aware of Philips's options under the thirty-day termination clause, and that it is a common risk taken by a manufacturer's representative that the manufacturer might at any time decide to take the account in-house (J.A. at 71). AP objected to the provision but each year it signed the contract.

*The Michigan Sales Representative Act*

AP attempts to argue that the Michigan Sales Representative Act supersedes the agreements' provisions that AP would not be entitled to post-termination commissions. AP cites language in the Act that "[a] provision in a contract between a principal and a sales representative purporting to waive any right under this section is void." Mich. Comp. Laws Ann. § 600.2961(8). The "right" that AP alleges was "waived" by the agreements was AP's right to receive "all commissions that are due at the time of termination." *Id.* § 600.2961(4).

In *Clark Bros. Sales Co. v. Dana Corp.*, 77 F. Supp. 2d 837 (E.D. Mich. 1999), the plaintiff was suing for payment of post-termination commissions under the Michigan statute. However, the written agreement between the parties provided that no post-termination commissions would be paid. The court held that the terms of the contract controlled, and that the Sales Representative Act did not operate to create a duty to pay post-termination commissions when the parties had agreed otherwise. *Id.* at 852 (holding that the statute "does not create a new obligation or impose a new duty to pay sales commissions" (citation omitted)).

*Fraud in the Inducement*

The district court held that AP failed to show that Philips fraudulently misled AP into signing the contracts. AP argues that by making oral statements such as "long-term sales equal long-term commissions," and by not disclosing its alleged Major Accounts Program, Philips deceived AP into thinking it could rely on a mutual expectation of a long-term relationship. AP claims that assurances given in response to Alexander's concern over the termination clause were "known by all of Philips's representatives to be untrue."

Under Michigan law, fraud must be established by clear and convincing evidence. *Lavean v. Cowels*, 835 F. Supp. 375, 384 (W.D. Mich. 1993). The alleged oral assurances that "long-term sales equal long-term commissions" and that successful manufacturer's representatives were not terminated do not establish fraud. For a claim of fraud based on a promise to perform in the future, AP must establish as a matter of law that Philips had no intention of fulfilling its promise at the time that it was made. *Berry v. Chrysler Corp.*, 150 F.2d 1002 (6th Cir. 1945).

Here, even considering the extrinsic evidence, and assuming AP's allegations are true, AP fails to show that Philips made oral assurances with the intent to deceive. First of all, such discussions of a long-term future do not necessarily conflict with the written agreements' termination provisions. Each of the four agreements contained a thirty-day termination for convenience clause. The agreements were renewed by the parties three years in a row, essentially ratifying the original bargain. The fact that Alexander continued to protest the clause indicates that he was well aware that the contracts, as executed, allowed Philips to cancel the deal at any time.

The existence of a Major Accounts Program likewise fails to establish that AP was fraudulently deceived into entering the agreements. AP argues that this program is evidence that Philips never intended to honor its promise of "long-term commissions." The testimony of a former employee of

February 8, 1991, GM sent a letter to Philips confirming that Philips had been chosen to develop a cruise control module for production years beginning in 1995. (J.A. at 34). This was "a momentous occasion" for Philips. Through 1992, AP continued to act as the facilitator for communications between Philips and GM.

On September 25, 1992, Philips notified AP that it was terminating the representative agreement effective November 1, 1992. According to AP, this came as a "complete shock," because the relationship seemed to be progressing well. Just two weeks earlier, on September 8, GM had asked Philips for a quote on a proposed new microprocessor. The termination letter stated that "[c]ommissions will be paid in accordance with [the 1992] Agreement." (J.A. at 35).

Philips decided to terminate AP in order to assume the management of the GM account itself. AP alleges that it was Philips's policy (unknown at the time to AP) to take in-house all accounts that reached a certain size under something called a "Major Accounts Program." A former Philips employee testified that while Philips did sometimes decide to take over the management of its accounts from representative firms, there was no set policy or account size for triggering such a decision. Rather, Philips decided which accounts to manage by itself on a case-by-case basis. (J.A. at 508-09).

In February 1993, Philips sent AP a check for $2,649.43 as a "final reconciliation" and a letter stating that the endorsement of the check "verifie[d] the completion and acknowledgment" of the relationship and released Philips of all obligations. (J.A. at 336). AP deposited the check. AP did no further work for Philips after the termination letter. GM subsequently purchased the microprocessors from Philips, and they have been installed in GM cars since 1995.

## DISCUSSION

*Standard of Review*

We review a grant of summary judgment *de novo*. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999). In doing so, we must view the evidence and all inferences to be drawn therefrom in a light most favorable to the nonmovant. *Keever v. City of Middletown*, 145 F.3d 809, 811 (6th Cir.), *cert. denied*, 525 U.S. 963 (1998). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

*The Written Agreements*

AP contends that equitable estoppel prohibits Philips from relying on the four corners of the contracts, that extrinsic evidence is necessary to interpret the terms of the agreements between the parties, and that the district court committed error by holding that the written documents constituted the entire agreement.

Under Michigan law, a court may not consider extrinsic evidence where the terms of the agreement are clear and unambiguous. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir. 1998). Here, the terms of all four agreements are neither unclear nor inconsistent. The much-discussed thirty-day termination clause, included over Alexander's repeated objections and ratified in the three subsequent agreements, does not indicate any question as to whether the relationship could be terminated at the will of either party. The very fact that Alexander protested the clause every year shows that he was only too well aware of its implications. Since Philips continually refused to make any modification to that term, and since AP continued to sign the contract, it may not supplant those agreements with evidence of contemporaneous assurances of a long-term relationship.

See, e.g., *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 690-91, (1999).

In *Harris Corp. v. Giesting & Assocs.*, 297 F.3d 1270 (11th Cir. 2002), a terminated manufacturer's representative firm argued that a termination-for-convenience clause, which it had protested but signed nonetheless, was ambiguous and therefore subject to interpretation in light of extrinsic evidence. The Eleventh Circuit held that the meaning of "termination for convenience" was plain on its face, and therefore excluded any consideration of parol evidence. *Id.* at 1273. Even though the firm may have had "an expectation that [the manufacturer] would not terminate the contract for convenience," the express terms of the contract allowed them to do so. *Id.* Likewise, the termination clause in this case is unambiguous as a matter of law.

Nor do the provisions for the payment of commissions introduce any ambiguity in the agreement upon which AP can base its claims. The written agreements unequivocally bar the payment of any post-termination commissions. AP's assertion that the oral statement, "long-term sales equal long-term commissions" constitutes "the essential terms of the contract" is not enough to establish that the written agreements must be interpreted in light of such parol evidence. *See, e.g.*, *Martin v. East Lansing Sch. Dist.*, 193 Mich. App. 166, 180 (1992).

Furthermore, each agreement contained an integration clause. Under Michigan law, "an integration clause in a written contract conclusively establishes that the parties intended the written contract to be the complete expression of their agreement," and the parol evidence rule bars the use of extrinsic evidence to contradict the terms of a written contract intended to be the final and complete expression of the contracting parties' agreement. *Wonderland Shopping Ctr. Venture Ltd. v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1095 (6th Cir. 2001). AP must therefore be held to the express terms of the agreements it executed.