NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0115n.06

No. 13-1239

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Feb 10, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MARK DIETRICH, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| BELL, INC., | ) | |
| | ) | **O P I N I O N** |
| *Defendant-Appellee*. | ) | |

BEFORE:    MOORE and McKEAGUE, Circuit Judges; HELMICK, District Judge.[1]

JEFFREY J. HELMICK, District Judge. We are presented with a dispute over an employment agreement between a manufacturer and its sales representative that is silent about termination. We must decide whether a provision in that agreement providing two years of commission payments on any new customer procured by the representative survives termination. Applying Michigan's rules of contract interpretation to the particular facts in this case, we find this compensation agreement specified a finite period of commissions on new accounts and does not have any conflicting termination provision, so the representative is entitled to commissions for a period after his termination. We reverse the district court's contrary decision.

I.

Defendant-Appellee Bell, Inc. hired Plaintiff-Appellant Mark Dietrich as an Account Executive in late 2009. Bell manufactures folding, corrugated cardboard cartons and Mr.

---

[*] The Honorable Jeffrey J. Helmick, United States District Judge for the Northern District of Ohio, sitting by designation.

Dietrich's role was to bring in new customer accounts. When it hired Mr. Dietrich, Bell provided him with an offer letter that spelled out certain details of the employment arrangement. The compensation portion is at issue here:

> Your starting compensation will be $85,000 (eighty-five thousand dollars) annualized base wages. In addition, you will receive a commission program as follows:
>
> - New Business Sales - you will receive 1.25% commission on new business sales in the first year of the business contract. This rate will be adjusted to 0.75% in the second year. Subsequent years will not be eligible for commission.
>
> - Commissions will be paid on a quarterly basis on shipment dollars minus freight. Fifteen percent (15%) of the quarterly commission dollars will be retained by the company and paid at year end to be trued up for returned product, unpaid invoices and product over 90 days old (unless terms are negotiated separately in the supply agreement with the customers).
>
>   o We will guarantee a commission of $1,000 per month to be paid quarterly for a maximum of 24 months with the qualifier that the guaranteed commission in the second year of your employment will only be paid if a minimum of $2MM (two million dollars) in new sales is booked in your first year.
>
>   o The guaranteed commissions will be deducted from actual commissions earned as outlined above should actual commissions exceed the guaranteed commission.

(R. 1 at 13.)

During his tenure, Mr. Dietrich brought in several new accounts for Bell and Bell paid him according to the agreement while he remained employed. In 2011, Bell terminated Mr. Dietrich's employment and stopped paying commissions.

Mr. Dietrich brought this suit against Bell to recover commissions for up to two years on each of the accounts he procured. He alleges Bell breached their contract, violated Michigan's Sales—Representative Commission Act, and was unjustly enriched. He moved for summary

2

judgment as to the first two counts and Bell cross-moved for summary judgment as to all of Mr. Dietrich's claims.

Because it determined the parties' agreement was silent about post-termination commissions, the district court applied the "procuring cause doctrine," a principle of fair dealing created to protect salespeople, to determine whether Mr. Dietrich was entitled to commissions after his termination. *Reed v. Kurdziel*, 89 N.W.2d 479, 483 (Mich. 1958) ("In Michigan, as well as in most jurisdictions, the agent is entitled to recover his commission whether or not be has personally concluded and completed the sale, it being sufficient if his efforts were the procuring cause of the sale."). Nevertheless, the district court found in Bell's favor because it determined this doctrine only applies to the acquisition of orders, not the acquisition of customers. *See William Kehoe Assocs. v. Ind. Tube Corp.*, 891 F.2d 293, *2 (6th Cir. 1989) (Table) ("Under Michigan law announced in *Reed v. Kurdziel*, . . . this court must conclude that it is the acquisition of orders, not the acquisition of the customer that is protected by the 'procuring cause' doctrine.").

Citing *Lilley v. BTM Corp.*, 958 F.2d 746, 751 (6th Cir. 1992), the district court noted the distinction between "customer procurement" and "sales procurement" commission arrangements. A sales procurement salesperson is paid only on those sales he personally brings in, but a customer procurement salesperson is paid on every purchase made by a customer the salesperson acquired for his employer. *Id.* The district court concluded that the contract's "New Business Sales" language put Mr. Dietrich into a sales procurement role and meant "Plaintiff must have procured all sales, even all reorders, in order to receive commissions on those sales or reorders that were procured after his termination." (R. 43 at 8 (citing *Jack Peddie & Assocs., Inc. v. Whitmor Mfg. Co., Inc.*, 980 F.2d 729, *7 (6th Cir. Dec 2, 1992) (Table) (noting that sales

procurement salespersons are not entitled to commissions on renewal order in which they do not participate, but finding the plaintiff was a customer procurement agent who may be entitled to commission on renewal orders); *Roberts Assocs., Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 653 (E.D. Mich. 1990) (finding that salespeople are not entitled to commissions on customer order renewals unless they have an express contract to that effect).)

On this reasoning, the district court declined to extend the procuring cause doctrine to Mr. Dietrich's claim for payment of the commissions. The court denied Mr. Dietrich's motion and granted judgment in favor of Bell on all claims.

## II.

## A.

Neither party has raised a question of jurisdiction, but we must nonetheless consider whether we have subject matter jurisdiction to decide this appeal. *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Intern. Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009). Mr. Dietrich originally filed this action in the Kent County, Michigan, Circuit Court. Bell removed the matter to the District Court for the Western District of Michigan, asserting that Mr. Dietrich was a citizen of Michigan, that Bell was incorporated under the laws of South Dakota and had its principal place of business in South Dakota, and that the amount in controversy exceeded $75,000. (R. 1 at 2.) Mr. Dietrich did not dispute these facts or otherwise contest removal. The district court had jurisdiction pursuant to 28 U.S.C. § 1332(a) and removal was proper pursuant to 28 U.S.C. § 1441.

The district court's decision granting judgment in Bell's favor represented the final order of that court and disposition of the case. (Judgment Entry, R. 45.) Mr. Dietrich timely filed a notice of appeal. This Court has jurisdiction to consider the appeal. 28 U.S.C. § 1291.

4

B.

We review a district court's grant of summary judgment *de novo*. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). A district court may grant summary judgment only if no genuine issue of material fact exists and one party is entitled to judgment as a matter of law. *Id.*

"Questions of contract interpretation, such as those that formed the basis of the District Court's grant of partial summary judgment, generally are considered to be questions of law subject to *de novo* review." *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005) (applying Michigan law). First, as a question of law, we must determine whether a written contract's language is ambiguous. *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003). Michigan courts read contracts as a whole and give language its ordinary and natural meaning. *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (applying Michigan law). "A contract is ambiguous if the language is susceptible to two or more reasonable interpretations." *D'Avanzo v. Wise & Marsac, P.C.*, 565 N.W.2d 915, 918 (Mich. Ct. App. 1997); *accord Wyandotte*, 262 F.3d at 585.

Next, where the contract is clear and unambiguous, it can be resolved as a matter of law, leaving no question for a fact finder. *Wyandotte*, 262 F.3d at 585. On the other hand, if the contract's language is ambiguous, the contracting parties' intent is a question of fact and extrinsic evidence is relevant in this determination. *Id.*

C.

At the threshold of this analysis is the question of whether the contract specifies Bell was to pay Mr. Dietrich commission for customer procurement or for sales procurement. *Lilley*, 958

5

F.2d at 751. "Whether an agent is entitled to commissions on a customer procurement or sales procurement basis is determined by the contract between the agent and the principal." *Id.*

Mr. Dietrich contends he was a "customer procurement" sales representative; that he brought in new customers and Bell paid him on all sales from those customers, without regard to whether he personally booked each order. In contrast, Bell argues the contract's language puts him squarely in the realm of sales procurement. It stresses the word "sales" in the sentence, "you will receive 1.25% commission on new business sales in the first year of the business contract" and claims this means Mr. Dietrich was a "sales procurement" sales representative and is not entitled to post-termination commissions. Bell asserts the language of the contract is unambiguous and examining extrinsic evidence to answer this question is inappropriate.

To determine whether Mr. Dietrich was a sales procurement or a customer procurement representative, we read the contract as a whole, giving ordinary and natural meaning to its language. *Wyandotte*, 262 F.3d at 585. The contract contains several instructive terms. First, it appoints Mr. Dietrich as "an Account Executive reporting directly to Tom Alton, Director of New Business Development." (R. 1 at 13.) Second, it compensates him by both base salary and commission for "new business sales" and, when it compensates him by commission, it does so only for two years from the inception of the customer's contract (at 1.25% for the first year and then at 0.75% for the second).[1] (*Id.*) Third, it creates a minimum commission payment, but sets a corresponding minimum sales threshold by saying: "the guaranteed commission in the second year of your employment will only be paid if a minimum $2MM (two million dollars) in new sales is booked in the first year." (*Id.*) And, fourth, it says: "you will be expected to travel as necessary to generate new business opportunities and support existing customers." (*Id.* at 14.)

---

[1] The parties do not dispute that the term "business contract" refers to the newly procured customer's contract with Bell, so we give that term the agreed meaning. *See* Restatement (Second) of Contracts § 201 (1981).

Reading the contract as a whole and giving ordinary meaning to its language, Mr. Dietrich was a "customer procurement" salesperson. By paying Mr. Dietrich 1.25% commission for the first year after he brought in a customer, 0.75% for the second year, and no commission thereafter, Bell incentivized Mr. Dietrich to procure new business contracts and did not incentivize him to sell anything to customers who had been with Bell for more than two years. This language would compel a salesperson to bring new accounts to his employer, which is the crux of the customer procurement model. In contrast, a sales procurement contract would typically incentivize sales without regard to the age of the customer relationship, as long as the salesperson was responsible for procuring the individual sale. *Lilley*, 958 F.2d at 751 ("Sales procurement allows an agent to recover a commission only on the specific sales that the agent procures."); *see also Militzer v. Kal-Die Casting Corp.*, 200 N.W.2d 323, 325 (Mich. Ct. App. 1972) (determining the plaintiff was a customer procurement salesperson because: "McCullough testified that plaintiff was to receive 5% on everything sold to Eaton after plaintiff had procured Eaton for a customer even if plaintiff had done nothing in selling a particular part.").

Where a manufacturer establishes a commission incentive program to reward procuring new accounts, pays the sales representative for only a limited time after the customer procurement as the award for procuring that account, and does not require the representative to personally book every sale, it creates a customer procurement arrangement. *See, e.g.*, *Militzer*, 200 N.W.2d at 494–95. (finding the sales representative was a customer procurement salesperson where the defendant promised its sales representative 5% commission on all sales to new customers he procured); *Pfam, Inc. v. Ind. Tube Corp.*, No. 06-11015, 2006 WL 3313772, *7 (E.D. Mich Nov 15, 2006) (finding an agreement to pay 3% to 5% on sales to new customers procured was a customer procurement agreement). Such is the case here.

Bell's contention that the word "sales" ends the inquiry is incorrect. Of course, in sales procurement mode, commissions are only paid when sales are booked. Nevertheless, the same is true in many customer procurement relationships; even where the agent need not be personally involved in every transaction, commissions are generally still based on sales made. *E.g.*, *Lilley*, 958 F.2d at 751; *Jack Peddie & Assocs.*, 980 F.2d 729 at \*7. Either way, "sales" is a necessary ingredient and the inclusion of the word does not help discern whether Mr. Dietrich was to be paid on all sales generated by a customer he brought in or only on those sales he personally procured. We must take care to avoid creating ambiguity where none exists, *Smith v. Physicians Health Plan, Inc.*, 514 N.W.2d 150, 157 (Mich. 1994), and allowing Bell to turn the inclusion of the word "sales" into ambiguity over how it was to compensate Mr. Dietrich would do just that.

As an ancillary matter, the contract's other terms also support this reading. Mr. Dietrich worked for the director of new business development, and his second year commission minimum was based on whether a minimum amount of sales "is booked" (presumably by anyone) rather than based on whether Mr. Dietrich personally booked those sales. Finally, the fact that Mr. Dietrich would have to travel not only to generate business but also to "support existing customers" does not change this analysis; the focus is on the commission portion of the compensation, and this statement does not change the nature of the commission compensation. Read as a whole, the contract is unambiguously one for customer procurement.

According to the terms of the written agreement, then, Mr. Dietrich would be entitled to receive two years of commissions on new customers he procured if Bell had not terminated him. We must determine, then, whether Bell's termination of Mr. Dietrich extinguished the two-year commission provision or whether it survives.

D.

To answer the question of whether Bell's termination of Mr. Dietrich's employment ended its obligation to pay commissions, we again employ contract interpretation rules to construe the contract governing their employment relationship. Our primary role in interpreting a contract under Michigan law is to determine and enforce the parties' intent. *Stine v. Cont'l Cas. Co.*, 349 N.W.2d 127, 137 (Mich. 1984). In cases where an otherwise valid contract is completely silent about the parties' intentions as to one point, courts must supply a term to resolve a dispute. Restatement (Second) of Contracts § 204. Nevertheless, "[c]ourts may not make a new contract for parties under the guise of a construction of the contract, if doing so will ignore the plain meaning of words chosen by the parties." *Zahn v. Kroger Co. of Mich.*, 764 N.W.2d 207, 211 (Mich. 2009).

The contract says nothing regarding termination; it provides no express answer to how the parties intended to terminate their relationship. Since the commission provision is explicit about its two-year termination, Mr. Dietrich argues the contract is complete and we need not read in another term. Bell, on the other hand, points to the contract's silence on termination and asks that we infer the procuring cause doctrine to fill this gap.

We note that Michigan law deems an employment contract that contains no duration as presumptively providing employment at will. *Rowe v. Montgomery Ward & Co., Inc.*, 473 N.W.2d 268, 271 (Mich. 1991). That is, with no termination provision, an employment contract does not continue forever, and courts presume the parties intended that either party could terminate it at will. Nevertheless, this "presumption may be overcome by proof of an express contract for a definite term . . . ." *Id.* In this case, the parties agree the contract created an at-will employment relationship between Bell and Mr. Dietrich; Bell could terminate Mr. Dietrich's

9

employment at its will. Bell and Mr. Dietrich disagree on whether the termination of Mr. Dietrich's employment terminated the two-year commission payout.

Both sides argue that the contract is unambiguous (although, they disagree as to what it unambiguously says). To determine whether terms are ambiguous, we read the contract as a whole in search of the contracting parties' intent. *Haring Charter Twp. v. Cadillac*, 811 N.W.2d 74, 81 (Mich. Ct. App. 2010). "Terms are ambiguous only if they cannot possibly be read together in harmony." *Id.* (citing *Cole v. Ladbroke Racing Mich., Inc.*, 614 N.W.2d 169 (Mich. Ct. App. 2000)). Reading the contract as a whole yields two conclusions: First, the parties unambiguously agreed to a two-year commission structure on new accounts Mr. Dietrich brought in. Second, because it lacks any mention of it, the contract manifests no intent as to what will happen in the event of Bell's termination of Mr. Dietrich.

The district court found "[t]he parties' agreement in this case is silent about post-termination commissions, and the necessity for applying the procuring cause doctrine—for inferring a principle of fair dealing—is therefore present." (R. 43 at 7.) We disagree; this invocation of the implied covenant of good faith and fair dealing was inappropriate because the contract contained an express term that would be altered by reading in this term. "An implied covenant of good faith and fair dealing in the performance of contracts is recognized by Michigan law only where one party to the contract makes its performance a matter of its own discretion." *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003). Thus, before the court can utilize the implied covenant of good faith and fair dealing (and invoke the procuring cause doctrine), it must determine that the contract deferred decision on a topic, that it lacked clarity, or that it omitted a term. *Id.* (quoting *Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 873 F.2d 873, 876 (5th Cir. 1989) (applying Michigan law)). "The obligation of good faith cannot be

10

employed, in interpreting a contract, to override express contract terms." *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 657 (6th Cir. 2000); *accord Stephenson*, 328 F.3d at 826–27. If the contract contains the parties' expression of their agreement, we cannot invoke the doctrine of good faith and fair dealing to supersede that expression. *Stephenson*, 328 F.3d at 827.

This turns our analysis to whether the contract contained an express term that we must enforce or whether it made one party's performance discretionary by being unclear, omitting a key term, or deferring a decision. Both sides agree that the agreement says nothing about commission payments in the event of termination of employment. Nevertheless, the commission provision does include its own durational provision: after one year, the commission rate drops from 1.25% to 0.75% and, after two years, it terminates entirely.

We must, of course, take care not to read in ambiguity where none exists. *Smith*, 514 N.W.2d at 157. Thus, while the contract lacks a durational term or a provision dealing with post-termination commissions, we cannot insert a duty of good faith and fair dealing (and the resultant procuring cause doctrine) because the contract contains an express termination for the commission payments. To read in an extra term, even if it would provide clarity, would be to dishonor the written agreement. "This approach, where judges divine the parties' reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 51, 664 N.W.2d 776, 782 (2003).

In *Militzer* the defendant corporation promised the plaintiff a commission on sales to new customers he procured and then, after the plaintiff procured a customer who was producing

11

significant sales and commission checks, altered the structure to reduce the plaintiff's commissions. 200 N.W.2d at 495. The court said, "[i]f defendant had desired to limit plaintiff's commission in terms of time or amount it could have done so, preferably in writing, in the original agreement." The same is true here; the contract promised Mr. Dietrich two years of commissions. If Bell wanted to limit that to the longer of two years or the time of termination, it could have done so in the agreement. *Id.*; *See also H.J. Tucker and Assocs. V. Allied Chucker and Eng'g Co.*, 595 N.W.2d 176, 183–84 (Mich. Ct. App. 1999) ("[A]fter the plaintiff in the present case had obtained substantial orders and accounts for the defendant and after much of plaintiff's time and energy had already been expended, defendant decided to make a downward "adjustment" to the plaintiff's five-percent commission.") Where the commission provision contained a finite term and Bell did not opt to insert an expiration on termination provision, we cannot read one in.

We reverse the district court's determination on Mr. Dietrich's breach of contract claim; the contract entitles him to commission payments for two years on those customers he procured for Bell (at the rates specified in the contract). We return the matter to the district court for further proceedings consistent with this opinion.

E.

After it read the contract as not providing for ongoing commission payments, the district court determined that Mr. Dietrich could not maintain his claim under the Sales Representatives—Commissions Act because the Act does not supersede agreements between parties. *See APJ Assocs., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 616 (6th Cir. 2003). Because we have determined that Mr. Dietrich is entitled to commissions under the agreement

with Bell, we reverse the district court's order as to this claim and return it to the court for further proceedings consistent with this opinion.

F.

The district court denied Mr. Dietrich's third claim, for breach of an implied contract or unjust enrichment. He does not, however, raise a claim on appeal regarding this, so we consider it waived. *Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995).

III.

Having determined the district court's interpretation of the agreement was incorrect, we must consider the proper disposition of this case. Mr. Dietrich argues we should not only reverse the district court's ruling on Bell's summary judgment motion, but also reverse its ruling on his summary judgment motion and grant judgment in his favor. Bell does not address this question.

We have made a *de novo* determination of the proper contract interpretation and concluded that, as a matter of law, the contract entitles Mr. Dietrich to commissions on accounts he procured for two years from each customer's contract start date. On this question, Mr. Dietrich is entitled to judgment in his favor on both his summary judgment motion and Bell's cross summary judgment motion. Even though this resolves the primary contention between the parties, the cross summary judgment motions have daylight between them; we therefore return the matter to the district court to implement our ruling by deciding a variety of remaining factual issues, such as which customers Mr. Dietrich procured, each customer's business contract's beginning date, the amount of eligible sales, and the appropriate measure of statutory damages.

For the reasons stated herein, we reverse the order of the district court and remand the matter for further proceedings consistent with this opinion.

13

**MCKEAGUE, Circuit Judge, dissenting.**

The Majority finds that the contract between Dietrich and Bell—which provided for commissions on "new business sales"—unambiguously provides Dietrich with customer-procurement commissions. I disagree with the majority's interpretation of the contract. I would instead find that the contract provided for sales-procurement commissions. Because the contract is silent on the issue of post-termination commissions, I would apply the procuring cause doctrine and affirm the judgment of the district court. I respectfully dissent.

**A.**

The first issue is whether the contract promises Dietrich sales-procurement commissions or customer-procurement commissions. *See Reed v. Kurdziel*, 89 N.W.2d 479, 482 (Mich. 1958) (noting that an agent's right to recover commissions depends upon the contract between the agent and the company). "Customer procurement allows an agent to recover a commission for all sales to a customer that the agent procured regardless of whether the agent was involved in the particular sale. Sales procurement allows an agent to recover a commission only on the specific sales that the agent procures." *Lilley v. BTM Corp.*, 958 F.2d 746, 751 (6th Cir. 1992). "Subsequent sales to the same customer that are not procured by the agent [under a sales-procurement commission] do not yield a commission." *Id.*

The contract's plain language indicates that Dietrich was promised sales-procurement commissions. The contract states that commissions were to be provided to Dietrich for "new business sales." *Id.* at 13, PageID # 13. Contrary to the majority opinion's assertion, Bell does not "turn the inclusion of the word 'sales' into ambiguity over how it was to compensate" Dietrich. Maj. Op. at 8. Bell simply relies on the fact that the contract uses the term "sales" rather than customers in arguing that it compensates Dietrich for sales procured rather than

14

customers procured. *See* R. 1, Contract at 13, PageID # 13. The use of the word "sales" is highly probative of the fact that these are sales-procurement commissions, just as use of the word "customers" would have led to the opposite conclusion. *See id.*

The relevant case law further demonstrates that Dietrich's commissions were based on sales procurement. In *Lilley v. BTM Corp.*, an agent was promised "a five percent *commission on sales*." 958 F.2d at 749 (emphasis added). In determining whether the promised commission was based on sales procurement or customer procurement, the *Lilley* court noted that the company stated in its answer to its complaint that the "parties had a customer procurement contract." *Id.* at 752. Despite this admission, the *Lilley* court still found that the overall discussion of the promised commission as well as the plain language of the parties' contract pointed to the fact that the promised commission was "based on sales procurement." *Id.* Similar to the contract in *Lilley*, Dietrich was promised "a [1.25% and then 0.75%] *commission on sales*." *See id.* at 749 (emphasis added). The relevant contractual language is identical, and Dietrich points to nothing in the record suggesting any admission by Bell concerning customer procurement. *See id.* at 752. Ultimately, Dietrich's claim that his commissions were based on customer procurement is less convincing than the similar claim that was rejected by this court in *Lilley*. *See id.*

*Militzer v. Kal-Die Casting Corp.*, 200 N.W.2d 323 (Mich. Ct. App. 1972), is also of no help to the majority opinion. In *Militzer*, the contract provided that the agent would be paid "a 5% Commission on all sales to *customers he procured* . . . ." *Id.* at 324 (emphasis added). No such contractual language concerning "customers" exists here. In *Militzer*, the plain meaning of the words "customers he procured" drove the court to conclude that the contract provided for customer-procurement commissions. *See* 200 N.W.2d at 324. The plain meaning of the words "new business sales" should similarly drive this court to the conclusion that Dietrich's commissions were based on sales procurement. *See id.* at 13, PageID # 13.

15

When the contract is read as a whole, there is only one conclusion: Dietrich's commissions were based on sales procurement. *See City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001). According to the contract, Dietrich had to first book two million dollars in "new *sales*" before he would be paid any commissions at all. R. 1, Contract at 13, PageID # 13 (emphasis added). Like the provision discussing the level of Dietrich's commissions, this two-million provision does not mention customers and instead focuses on sales. Other contractual provisions cited as support in the majority opinion, such as to which employee Dietrich reported and the travel associated with the job, do nothing to advance Dietrich's claim that the commissions were customer-procurement commissions. Because the plain meaning of the contract and the relevant case law indicate that the commissions were based on sales procurement, I would find that the contract unambiguously provides for sales-procurement commissions.

**B.**

The second issue is whether the contract between Dietrich and Bell contemplated post-termination commissions. As the majority opinion concedes, the contract "says nothing regarding termination[.]" Maj. Op. at 9; *see also id.* at 10 (noting that the contract "lacks any mention" of what would occur in the event of termination). As the district court observed, even Dietrich himself admits that the contract "does not explicitly discuss termination." *See* R. 43, Dist. Ct. Op. at 7 n.2 (internal citation omitted). The contract is thus "silent as to entitlement to post-termination commissions." *Fernandez v. Powerquest Boats, Inc.*, 798 F. Supp. 458, 460 (W.D. Mich. 1992).

Under Michigan law, when a "contract is silent [as to post-termination commissions], the agent is entitled to recover a commission on a sale, whether or not he personally concluded it,

16

only where it can be shown that his efforts were the 'procuring cause.'" *Id.* at 461 (quoting *Roberts Assocs., Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 652 (E.D. Mich. 1990)). The procuring cause doctrine is implied in commission-sales contracts and is based on the principle of fair dealing. *See Reed*, 89 N.W.2d at 482–83; *see also Jack Peddie & Assocs., Inc. v. Whitmor Mfg. Co., Inc.*, 980 F.2d 729 (6th Cir. 1992) (unpublished) (applying this doctrine). The procuring cause doctrine applies "when a sales agent's authority or employment is terminated and *no explicit agreement had been reached over the payment of commissions in the event of termination.*" *Hardy v. Reynolds & Reynolds Co.*, 311 F. App'x 759, 765 (6th Cir. 2009) (emphasis added). As to the contract between Bell and Dietrich, it is clear that it does not contain an "explicit agreement . . . over the payment of commissions in the event of termination."[1] *Id.* Therefore the district court was correct in applying the procuring cause doctrine. *See id.*

It is well-settled that under Michigan law, "it is the acquisition of orders, not the acquisition of the customer that is protected by the 'procuring cause' doctrine." *William Kehoe Assocs. v. Ind. Tube Co.*, 891 F.2d 293 (6th Cir. 1989) (discussing *Reed*, 89 N.W.2d at 479). "Where the agent does not participate in the negotiation of a given contract of sale, the agent is not the 'procuring cause' of post-termination sales, even though he may have originally introduced the parties." *APJ Assocs., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 616 (6th Cir. 2003) (citing *Roberts Assocs.*, 741 F. Supp. at 652).

Applying that standard here, the district court's analysis is unassailable. "Given the 'New Business Sales' language of their [contract], [Dietrich] must have procured all sales, even all reorders, in order to receive commissions on those sales or reorders that were procured after

---

[1] The contract specifies distinct levels of sales-procurement commissions for two different years, but this language does not address what would occur in the event of termination.

17

his termination." R. 43, Dist. Ct. Op. at 8, PageID # 640 (internal citations omitted). But both parties agree that Dietrich was already compensated for the commissions on the sales that he obtained prior to Bell terminating his employment.[2] And even if Dietrich introduced Bay Valley to Bell, both parties agree that Bay Valley's orders were placed six months after Dietrich's termination. *See APJ Assocs.*, 317 F.3d at 616.

Finally, the district court's analysis of Dietrich's claims of violations under the Michigan Sales Representative Commissions Act, Mich. Comp. Laws § 600.2961(2), of breach of implied contract and unjust enrichment was sound because the Act does not "supersede an agreement of the parties regarding payment of post-termination commissions." R. 43, Dist. Ct. Op. at 9, PageID # 641 (citing *APJ Assocs.*, 317 F.3d at 616). Here, there is a contract between Bell and Dietrich concerning sales-procurement commissions, and thus the Act does not supersede the agreement between the parties. *See Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993) (noting that courts only imply contractual terms when there is "no express contract covering the same subject matter"). Even viewing the evidence in the in the light most favorable to Dietrich, all of Dietrich's claims fail as a matter of law, and the district court's grant of summary judgment to Bell was appropriate. I respectfully dissent.

---

[2] The parties agree that Dietrich's employment was terminated because he lied to one of his superiors.