NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0298n.06

No. 15-2005

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 07, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MICHAEL DYBOWSKI, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| VCE COMPANY LLC, | ) | EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: MOORE, GIBBONS, and DAVIS,[*] Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** This appeal concerns a dispute over incentive compensation allegedly owed to Michael Dybowski, a VCE salesman, for his work securing a large deal with OnStar. After the deal closed, VCE paid Dybowski a commission based on 75% of the total value of the deal. Dybowski claims that he is owed a commission based on 100% of the value of the deal, and that VCE breached its Commission Plan (Plan) and violated Michigan's Sales Representative Commission Act (SRCA) by paying him less. The district court granted summary judgment to VCE, finding that the Plan unambiguously gave VCE the right to adjust commission payments in certain special circumstances, as were present in the OnStar deal. Because we agree that the Plan vests VCE with discretion to adjust commissions in situations like the one here, we affirm the district court.

---

[*]The Honorable Andre M. Davis, Senior United States Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

I.

VCE was created by EMC, Cisco, and VMware. It sells "vBlock Systems," which are customizable, cloud-based computer network infrastructure systems combining products from all three of VCE's parent companies. In May 2013, Michael Dybowski was hired as a Senior vAccount Manager in VCE's Enterprise Sales Group. In this role, Dybowski was expected to sell vBlock Systems to prospective clients in Michigan, his assigned territory. Dybowski reported directly to Joe Vranicar, VCE's District Vice President of Sales.

A.      *Terms and Conditions of Dybowski's Employment and Compensation*

Dybowski was paid a base salary of $135,000 per year at VCE, but he was also eligible to earn commissions on his sales. When he began at VCE, Dybowski received a Goal Acknowledgement Form (GAF), which set his 2013 sales quota target at $7,240,000 and his 2013 commissions target at $78,750. The GAF along with the Commission Plan established the terms and conditions of how Dybowski could earn commissions.[1] Under the Plan, his commissions were calculated by multiplying his "base commission rate" by the amount of sales credited to his sales quota for a particular transaction. When he started, Dybowski's base commission rate was 0.01087707018232044, his prorated yearly commission target ($78,750) divided by his prorated yearly quota target ($7,240,000). So for example, when Dybowski made a sale to Beaumont Hospital in the amount of $487,004, his sales quota was credited in this amount, the amount was multiplied by his base commission rate, and he received $5,297.17 in commission.

Under the Plan, VCE reserved the right to adjust quota credit amounts in certain situations. Part 1, Section 6.0 of the Plan, entitled "Special Circumstances" but commonly

_____

[1] Dybowski received a copy of the Plan when he began work at VCE and he signed a copy of his GAF on August 27, 2013 acknowledging that the Plan and GAF set forth the controlling terms for earning commissions.

known as the "windfall clause," allows the CEO, Senior Vice President (SVP), or Vice Presidents (VPs) of the company to:

> [a]uthorize adjustment of or reduction of commissions or the assignment of non-standard commission rates and/or Quota credit. Such circumstances include, but are not limited to, *when the total value of a deal (may include multiple sales orders or transactions) represents more than 50% of your assigned annual Quota (as set forth in your GAF)*, deals at zero field margin or below or any deal that exceeds values established by your sales group. Other special circumstances may include deals that require unusual or significant management or corporate involvement, deals that are unexpected (including but not limited to deals that aren't properly forecasted) and/or are not included in your assigned Quota and *deals where you had limited involvement or effort.*

Def.'s Mot. Summ. J., Ex. 11, 14, ECF No. 19-1 (emphasis added). According to testimony from Vranicar and Tim Page, VCE's Vice President of Sales, the windfall clause allows VCE to make adjustments when a sales representative's quota is set too low, and it also addresses circumstances where a newly hired sales representative "walks into" a very large sale already in progress and/or where the representative does not play a significant role in a particular sale. Vranicar Dep. 15, ECF No. 18-1. Page testified that he reviewed every deal that triggered the windfall clause, including deals where the value exceeded 50% of a sales representative's quota, and he authorized all commission adjustments under the windfall clause. In making sales quota adjustments, Page considered the recommendations of district vice presidents, like Vranicar. Under Part 3, Section 6.0 of the Plan, "VCE reserves the right to reduce, modify, [or] withhold Play payments . . . based on . . . VCE determination of special circumstances, with or without prior notice, and either retroactively or prospectively." Def.'s Mot. Summ. J., Ex. 11, 34, ECF No. 19-1.

Part 2 of the Plan lays out the terms and conditions generally applicable to all sales groups as well as the terms specifically applicable to particular sales groups. Like Part 1,

Section 6.0, Part 2, Section 1.1 reflects VCE's authority to adjust quota credit in certain special circumstances, including when the total value of a deal is more than 50% of a sale representative's annual assigned quota. Part 2, Section 3.1 specifies that representatives in the Enterprise Sales Group are to be paid commissions monthly, with "100% of the commission . . . advanced and associated Quota credit allocated upon booking." Def.'s Mot. Summ. J., Ex. 11, 18, ECF No. 19-1. Section 3.1 goes on to say that "[t]he initial allocation of Quota credit is subject to adjustment based upon the revenue actually collected for a transaction." *Id.*

### B.       The OnStar Deal

When he was hired, Dybowski was assigned to assist in closing a series of transactions that were part of an extensive deal with OnStar. Dybowski acknowledged that the OnStar deal had been ongoing for some time before he started work at VCEEMC's sales team, at OnStar's request, spearheaded the deal, and it is undisputed that VCE and Dybowski played a supporting role.

The OnStar deal closed in December 2013. There is some confusion about the total value of the OnStar deal. The district court put the total value of the deal at $16,605,318. On appeal, Dybowski contends that the aggregate value was $20,676,943.17. VCE credited Dybowski's sales quota with $11,705,787.69, which VCE claims was 75% of the deal value. That would make the total value $15,607,716.92. Ultimately, the exact value of the deal is not important. There is no question that the amount far exceeded 50% of Dybowski's annual quota credit ($3,710,000), which triggered review by Page under the windfall clause. Page sought the input of Vranicar, Dybowski's direct supervisor, who, based on his own involvement in the deal, suggested that Dybowski's quota be credited with 75% of the total value. Page adopted Vranicar's suggestion and credited Dybowski's commission quota with 75% of the value of the

deal. This value was multiplied by Dybowski's base commission rate, and he was paid $127,324.69 in commission.

### C. Procedural History

On February 11, 2014, Dybowski resigned. Three months later he filed a state-court complaint in the Circuit Court for the County of Oakland, Michigan asserting a breach of contract claim and a claim under the Michigan SCRA. VCE filed a notice of removal, pursuant to 28 U.S.C. § 1441 on June 10, 2014. On March 10, 2015, VCE moved for summary judgment, which the district court granted on July 24, 2015.

## II.

A district court's grant of summary judgment is reviewed *de novo*. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe all reasonable inferences in favor of the nonmoving party. *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 818 (6th Cir. 2015) (citing *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The central issue is whether the evidence—viewed in the light most favorable to the nonmoving party—presents a question of fact sufficient to require submission to a fact-finder, "or whether the evidence is so one-sided that the moving party must prevail as a matter of law." *Martin Cty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 593 (6th Cir. 2013).

Because this case arises under federal diversity jurisdiction, 28 U.S.C. § 1332, we apply the law of the forum state, here Michigan. *See Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008). Both parties are from Michigan, contract performance was to and did occur in Michigan, and neither party contests that Michigan law governs this dispute.

In considering a breach of contract claim, our primary goal must be to ascertain and honor the intent of the parties. *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994). In doing so, the language of the contract must be construed according to its plain and ordinary meaning, rather than given strained and technical constructions. *Dillon v. DeNooyer Chevrolet Geo*, 550 N.W.2d 846, 848 (Mich. Ct. App. 1996). The contract should be considered as a whole, giving effect to every word, phrase, and clause, and the court should avoid an interpretation that would render any part of the contract superfluous or nugatory. *Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997) (citing *Associated Truck Lines, Inc. v. Baer*, 77 N.W.2d 384 (Mich. 1956)). Where the language of a contract is plain and unambiguous, a court must apply the terms as written. After all, an unambiguous contract is the best evidence of the parties' intent, negating any need to rely on outside evidence of intent. *Soltis v. J.C. Penney Corp.*, No. 15-1532, 2015 WL 9245244, at *2 (6th Cir. Dec. 18, 2015). However, when the language is unclear or susceptible to multiple meanings, a court may consider relevant extrinsic evidence of the parties' intent. *See Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010).

A.

The contract at issue here is plain enough. Part 1, Section 6.0, the windfall clause, authorizes "adjustment of or reduction of . . . Quota credit" in certain special circumstances including "when the total value of a deal . . . represents more than 50% of [a sales representative's] assigned annual Quota (as set forth in [the representative's] GAF . . . ." Def.'s Mot. Summ. J., Ex. 11, 14, ECF No. 19-1. "Other special circumstances may include deals that require unusual or significant management or corporate involvement . . . and deals where [the sales representative] had limited involvement." *Id.* This language clearly permitted VCE to alter Dybowski's quota credit for the OnStar deal. The deal was well in excess of 50% of Dybowski's

annual quota. It was also a situation where VCE's parent company, EMC, took the lead sales role and where VCE and Dybowski admittedly played a supporting role.

Dybowski, however, asserts that Part 2, Section 3.1 unambiguously requires VCE to pay him a commission consistent with 100% of the aggregate value of the OnStar deal. Part 2, Section 3.1 of the Plan is titled "Commission Payment & Quota Credit Schedule." *Id.* at 18. As its name implies, the section sets out the schedule for when representatives in the Enterprise Sales Group will receive commission payment and quota credit. It states, in relevant part, that "[c]ommission is calculated and paid monthly, within a reasonable time following the end of each calendar month. 100% of the commission is advanced and associated Quota credit [is] allocated upon booking. . . . The initial allocation of Quota credit is subject to adjustment based upon the revenue actually collected for a transaction." *Id.* at 18–19. In Dybowski's estimation, this clause supplants the windfall clause and requires VCE to credit him with 100% of the aggregate value of any sale, subject only to adjustments based on the revenue later collected from the client.

Dybowski's reading finds conflict where there is none. As the district court observed, Part 1, Section 6.0 and Part 2, Section 3.1 have nothing to do with one another. Part 2, Section 3.1 is a schedule denoting that commission payments will be made upon booking, not upon earning. While Part 2, Section 3.1 states that "[c]ommission is calculated and paid monthly," it does not purport to define how commissions are calculated. *Id.* at 18. Rather, Part 1, Section 4.0 (along with Dybowski's GAF) establishes how commissions will be calculated. *See id.* at 9–11. Part 2, Section 3.1 merely notes that 100% of that amount will be paid upon booking; it does not institute a different method for calculating commission payments or quota credit, nor does it suggest that Enterprise Sales Group representatives will always be paid commissions in

accordance with 100% of the aggregate value of a sale, regardless of the circumstances. Were it otherwise, Part 2, Section 3.1 would not only conflict with the windfall clause, but also with Part 3, Section 6.0, which reserves to VCE the right to reduce or modify Plan payments based on a determination of special circumstances "with or without prior notice, and either retroactively or prospectively." *Id.* at 34.

Dybowski relies on Part 1, Section 1.2.1 to argue that Part 2, Section 3.1 supersedes the windfall clause. Part 1, Section 1.2.1 states that "[t]he specific terms and conditions applicable to each sales group set forth in Part 2 supersede any general terms and conditions that may conflict with Part 1 of this document." *Id.* at 6. Dybowski's position entirely ignores Part 2, Section 1.1, which reiterates that VCE reserves the right to assign non-standard commission rates and/or quota credit under certain circumstances, including in deals where the total value exceeds 50% of a sale representative's assigned annual quota. *See id.* at 15.

If Dybowski's reading were correct, it would mean that the parties intended the windfall clause, Part 1, Section 4.0, Part 2, Section 1.1, and Part 3, Section 6.0, to be inapplicable to the Enterprise Sales Group. This cannot be the case. It would be particularly odd to find such intent in a portion of the contract called a "Schedule," and the result would be all the more surprising given that the part of the Plan dealing specifically with VCE's sales groups begins by reiterating that VCE reserves the right to assign non-standard quota credit in certain situations, including circumstances present in the OnStar deal. Part 2, Section 3.1 does not evince any intent to supplant other portions of the Plan, and without a clear indication of that intent, we decline to read the clause in that way. *See Workmon*, 118 F.3d at 459 ("[I]f reasonably possible, all parts and every word should be considered; no part should be eliminated or stricken by another part unless absolutely necessary.") (citing *Baer*, 77 N.W.2d at 384).

It is clear that VCE retained discretion to adjust Dybowski's commission payments and quota credit in certain situations. Because Dybowski does not claim that VCE's reduction in his quota credit was made in bad faith or was the product of fraud or a gross mistake in judgment, *see Brozo v. Oracle Corp.*, 324 F.3d 661, 667 (8th Cir. 2003), we enforce the contract according to its plain meaning..

*B.*

Under the plain terms of the windfall clause, only VCE's CEO, SVP, or VPs were authorized to adjust a sales representative's quota credit. Dybowski argues that VCE breached the Plan when it allowed Vranicar, Dybowski's direct supervisor, to adjust his quota credit. This argument is rebutted by record evidence showing that Page, VCE's Vice President of Sales, made the final decision to adjust Dybowski's quota credit. While it is true that Vranicar made a recommendation to Page, Page made the final decision, in accordance with the terms of the windfall clause.

*C.*

Dybowski next asserts that VCE was required to provide him notice prior to any adjustments under the windfall clause. He points to Part 1, Section 1.3, "Modification of Terms and Conditions" for support. However, this clause only requires written notice for changes to the terms and conditions of the Plan itself, not for changes to a sales representative's quota credit. Def.'s Mot. Summ. J., Ex. 11, 7, ECF No. 19-1. Contrary to Dybowski's interpretation, the Plan, at Part 3, Section 6.0 clearly reserves VCE the right to modify compensation "based on . . . special circumstances" "with or without prior notice, and either retroactively or prospectively." *Id.* at 34.

D.

Because Dybowski's common law claim fails, so too does his SRCA claim. The SRCA imposes no additional duty beyond that imposed by the parties' agreement. *See APJ Assocs., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 616 (6th Cir. 2003) (noting that the SRCA does not supersede the parties' contract and, thus, that it only requires the payment of commissions due under the contract.) Thus, "if there is no liability on the contract claim for sales commissions, there is no corresponding violation of the Act." *Hardy v. Reynolds & Reynolds Co.*, 311 F. App'x 759, 766 (6th Cir. 2009) (unpublished) (per curiam).

E.

Dybowski raises two final arguments. First, he asserts that the windfall clause is a condition subsequent and that, therefore, VCE was required to raise it as an affirmative defense in its answer. Under Michigan law, a condition subsequent is "a condition that, if not met by one party, abrogates the other party's obligation to perform." *Archambo v. Lawyers Title Ins. Corp.*, 646 N.W.2d 170, 176 (Mich. 2002).[2] Dybowski maintains that VCE was required to raise the windfall clause as a defense against its obligation to pay him the full commission he is owed. There is a problem with this reasoning. VCE never had a contractual obligation to pay Dybowski a commission in accordance with the total value of the OnStar deal. The ability to apply the windfall clause to deals like the one with OnStar was an option that VCE always had under the contract. VCE's reliance on the windfall clause is not an attempt to vitiate its contractual obligations but rather an exercise of the discretion it reserved under the plain terms of the Plan.

---

[2] It is unclear how the concept of a condition subsequent operates in the context of a unilateral contract where one party has accepted an offer of payment by completing performance. Because we conclude that VCE had no obligation to pay Dybowski a commission based on 100% of the OnStar deal value, we do not decide whether a condition subsequent, as it is defined by Michigan law, is applicable to this situation.

Even assuming that the windfall clause is a condition subsequent, VCE did not waive it. "Failure to raise an affirmative defense by responsive pleading does not always result in waiver. The purpose of Rule 8(c) of the Federal Rules of Civil Procedure is to give the opposing party notice of the affirmative defense and a chance to respond." *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997) (citation omitted). Here, Dybowski had ample notice of VCE's reliance on the windfall clause. VCE's discovery responses set forth how it calculated Dybowski's commission, and Dybowski's counsel questioned Vranicar and Page about the clause during their depositions.

Astonishingly, Dybowski's final argument is that the Plan contains an illusory promise. Not only was this argument not raised before the district court, but also, if true, it would completely defeat Dybowski's own claim. The only question before this court is whether VCE breached its obligations to pay commissions under the Plan. If the Plan is unenforceable because it contains an illusory promise, then it is unclear how Dybowski can sue for breach of contract. *See, e.g.*, *Meyer v. AmerisourceBergen Drug Corp.*, 264 F. App'x 470, 475–76 (6th Cir. 2008) (unpublished) (finding no breach of incentive compensation agreement where agreement contained an illusory promise to pay incentive compensation).

## III.

Based on the foregoing reasons, we affirm the district court's order granting summary judgment to VCE.